BEARD RESEARCH, INC. and CB Research & Development, Inc., Plaintiffs,

v.

Michael J. KATES, ASDI, Inc., Advanced Synthesis Group, Inc., Alan Blize, Garry Smith, Michael Wagaman, and Stephen Jones, Defendants.

Civil Action No. 1316–VCP.

Court of Chancery of Delaware.

Submitted: Dec. 3, 2009.

Decided: April 23, 2010.

James S. Green, Esquire, R. Karl Hill, Esquire, Kevin A. Guerke, Esquire, Seitz, Van Ogtrop & Green, P.A., Wilmington, Delaware, Attorneys for Plaintiffs.

John A. Elzufon, Esquire, Elzufon, Austin, Reardon, Tarlov & Mondell, P.A., Wilmington, Delaware, Attorneys for Defendants Michael J. Kates, Garry Smith, Michael Wagaman, Steven Jones, and Advanced Synthesis Group, Inc.

Barry M. Willoughby, Esquire, John W. Shaw, Esquire, Elena C. Norman, Esquire, Young, Conaway, Stargatt & Taylor, LLP, Wilmington, Delaware, Attorneys for Defendants ASDI, Inc. and Alan Blize.

## OPINION

PARSONS, Vice Chancellor.

Plaintiffs, two companies once involved in the development and sale of chemical compounds, brought this action against a number of business competitors and former employees claiming they were the victim of a scheme by these entities and individuals to put them out of business. Plaintiffs, Charles Beard Research & Development, Inc. ("CB") and Beard Research, Inc. ("BR," collectively, with CB, "Plaintiffs"), hired Michael Kates in 1998 and made him second in command in both companies to founder Charles Beard. By 2003, Kates was ready to move on and began talking frequently with Alan Blize, whose employer, ASDI, Inc. ("ASDI"), was

looking to set up a company that would compete with Plaintiffs. Blize knew Kates from his previous job at Pfizer, Inc. ("Pfizer"), Plaintiffs' biggest customer. In early 2004, Kates left Plaintiffs to take a job with Advanced Synthesis Group, Inc. ("ASG"), a company funded by ASDI. Three other CB employees followed Kates to ASG. Within a couple of months of Kates's departure, Pfizer signed a contract with ASG and terminated a $22 million contract it had with Plaintiffs, the biggest contract in Plaintiffs' history. In the same timeframe, Plaintiffs saw numerous compounds that they alone had marketed listed for sale in a new ASG catalog.

Plaintiffs then filed suit against ASDI, ASG, Pfizer,[1] Blize, Kates, and the three former employees who followed Kates to ASG (Garry Smith, Steven Jones, and Michael Wagaman). The Complaint asserted eleven claims against various combinations of these defendants. Plaintiffs pursued five of these claims (misappropriation of trade secrets, breach of fiduciary duty, aiding and abetting a breach of fiduciary duty, tortious interference with contractual relations, and tortious interference with prospective business relations) through trial.

This Opinion constitutes my post-trial findings of fact and conclusions of law as to those claims. For the reasons stated herein, I conclude that: (1) ASDI, ASG, Kates, and Smith are liable for misappropriation of trade secrets; (2) Kates is liable for breach of fiduciary duty; (3) ASDI and Blize are liable for aiding and abetting Kates's breach of fiduciary duty; (4) none of the defendants are liable for tortious interference with contractual relations; and (5) ASDI, ASG, Blize, and Kates are liable for tortious interference with prospective business relations. Finally, I conclude that ASDI, ASG, Blize, and Kates are jointly and severally liable to Plaintiffs for damages in the amount of $4,338,463, while Smith is liable to Plaintiffs jointly and severally for $668,544 of this amount. ASDI, ASG, Blize, Kates, and Smith are also liable for pre- and post-judgment interest on the amounts that they owe as damages.

## I. BACKGROUND

### A. The Parties

Plaintiff CB is a Delaware corporation that was organized as a chemistry-based contract research organization ("CRO") in 1991.[2] CB's business focused on one-off and catalog work.[3] CB's founder and namesake, Charles Beard ("Beard"), has forty-five years of experience in pharmaceutical research, including significant experience in process chemistry, which involves the manufacture of large quantities of chemical material.[4] Because of Beard's expertise in process chemistry, CB's busi-

---

1. Plaintiffs subsequently settled with Pfizer.

2. In the chemistry field, a CRO is a chemistry outsourcing service that provides chemical compounds to end-users, such as pharmaceutical companies.

3. JX 5; T. Tr. 1033–35 (Beard). When, as here, the identity of the witness is not clear from the text, it is indicated parenthetically. One-off work involves individual projects to synthesize compounds desired by customers. The catalog concept involves having certain chemical structures available for immediate purchase at a fixed price through a catalog.

CB's catalog was comprised of "intermediates" created and designed by CB scientists, which serve as building blocks to make compounds used in the pharmaceutical, bio-pharmaceutical, and agricultural industries to produce both large and small scale quantities of desired compounds. Pls.' Opening Br. ("POB") 22.

4. T. Tr. 1029 (Beard). Process chemistry differs from medicinal chemistry, for example, which focuses on developing new drugs without a concern for soundness, elegance, or efficiency. Id. at 822 (Grabowski).

ness model focused on making large quantities of compounds, sometimes in the hundreds of kilograms.[5] CB sold all of its assets to Adesis, Inc. ("Adesis"), a company in which Beard is a co-owner, for $3.4 million on September 1, 2005.[6]

Beard organized Plaintiff BR as a Delaware corporation in 1999 to provide full time equivalent chemists ("FTEs").[7] FTEs are chemists, usually with PhDs, hired by a CRO to service a client under an arrangement where the CRO pays the chemists' salaries and benefits and receives a set annual fee from the client.[8] In the fall of 2004, Beard closed down BR, and CB took over BR's FTE work.[9]

Defendant ASDI is a Delaware corporation formed as the successor to Analytical Services of Delaware, Inc. ASDI was founded by Ronald Paloni and runs its operations from Newark, Delaware.[10] ASDI runs a "monomer store," through which it stores and ships chemical compounds to chemists worldwide.[11]

Defendant Advanced Synthesis Group, Inc. ("ASG") was formed initially as Main-Line Chemical Limited on December 19, 2003.[12] At that time, ASG's shareholders were Kates's wife, Wendy, Paloni and his wife, Oksana, Blize, and Smith.[13] ASDI provided start-up funding for ASG, which generally was viewed as an affiliate of ASDI, even though ASDI did not own any ASG stock.[14] ASG's business model involved the custom synthesis of chemical compounds to create small libraries.[15] ASG ceased operations in 2005 when ASDI purchased its assets.[16]

Defendant Blize served as a "Molecular Broker"[17] at Pfizer from 1995 to 2002.[18] In this capacity, Blize managed Pfizer's relations with CB and BR.[19] Blize joined ASDI in 2002 and became its chief executive officer ("CEO") in June 2006 and a part-owner in 2007.[20] ASDI hired Blize, in part, to develop custom synthesis operations.[21]

Defendant Kates was hired by CB as a chemist in 1998 and later became CB's Executive Vice President and Director of Marketing.[22] When BR was founded in

---

5. Dep. of Charles Beard ("Beard Dep.") 306; T. Tr. 492 (Cottone).

6. DX 87.

7. PX 131.

8. JX 5.

9. Beard Dep. 746–47.

10. Dep. of Ronald Paloni ("Paloni Dep.") 26–30.

11. PX 97.

12. PX 32. At some point, MainLine Chemical Limited was renamed ASG. For sake of simplicity, I will refer to this entity as ASG.

13. T. Tr. 224 (Blize). Michael Kates was not a shareholder of ASG. Id.

14. DX 81 at ASDIY 1079; T. Tr. 225 (Blize), 323 (Whittaker); Dep. of Alan Blize ("Blize Dep.") 295.

15. T. Tr. 91 (Smith), 758 (Kates).

16. Blize Dep. 211; T. Tr. 1266 (Paloni).

17. A "Molecular Broker" manages custom synthetic services, chemists, and CROs. PX 1.

18. Pfizer originally was named by CB and BR as a Defendant in this action, but settled with both Plaintiffs in November 2007. Docket Item ("D.I.") 242.

19. PX 1.

20. T. Tr. 181–82 (Blize); Blize Dep. 340; Paloni Dep. 33. Before becoming CEO, Blize served as ASDI's chief operating officer.

21. T. Tr. 184–85 (Blize).

22. Id. at 647, 718 (Kates); Pretrial Stip. and Order in Kates v. Beard Research, Inc., Del. Ch. C.A. No. 1480–VCP ("1480 Stip."). ASDI and Blize deny that the 1480 Stipulation ap-

December 2003, Kates received a 33 percent ownership stake in the company and was appointed a director and an officer.[23] Kates was at all times an at-will employee of both CB and BR and never signed a written noncompete agreement.[24] Kates left CB and BR on February 13, 2004 to become ASG's President.[25] Kates was removed as a director and officer of BR on the same date.[26]

Defendant Smith began working at CB in November 2001 and became CB's Director of Chemistry in April 2002.[27] Smith left CB on March 26, 2004 to take a job with ASG. Smith is currently ASDI's Director of Chemistry.[28]

Defendant Wagaman served as a Senior Group Leader at CB from June 2000 to April 27, 2004, when he took a job as Senior Director, Global Chemistry for ASDI.[29]

Defendant Jones[30] worked at CB as a Senior Scientist and Group Leader from January 2003 until April 8, 2004. After leaving CB, Jones took a job with ASG, where he served as a Group Leader and Director of Chemistry.[31]

## B. Facts

In early 1999, CB first solicited custom synthesis business from Parke–Davis.[32] Over the next year, CB completed roughly thirty-five one-off projects for Parke–Davis and Pfizer.[33] In September 2000, BR and Pfizer agreed to a contract whereby Pfizer would pay BR for FTE work.[34] Having been very satisfied with BR's work under this contract, Pfizer began in early 2002 to discuss a more extensive collaboration with CB and BR.[35] Within the next year, Pfizer and CB executed two separate two-way confidentiality agreements whereby Pfizer agreed to protect the confidentiality of CB proprietary information.[36]

In December 2002, Pfizer and CB agreed to a nonexclusive contract worth over $22 million (the "Pfizer Contract" or the "Contract"). Under the Contract, Pfizer agreed to provide funding for at least sixteen FTEs at a minimum rate of $226,000 per year and give CB at least $950,000 per quarter in one-off work for

plies to them because they are not parties to that action. As discussed below, I find that Kates owed fiduciary duties to both CB and BR even without considering this stipulation.

23. DX 186; Trial Tr. in *Kates v. Beard Research, Inc.*, Del. Ch. C.A. No. 1480–VCP ("1480 Tr.") 251; Beard Dep. 746–47.

24. T. Tr. 1061–63 (Beard).

25. DX 229 at KATES 83.

26. DX 186.

27. PX 119.

28. T. Tr. 8–12 (Smith).

29. PX 274.

30. ASDI, ASG, Blize, Kates, Smith, Wagaman, and Jones, collectively, will be referred to herein as "Defendants."

31. PX 268.

32. PX 444. Parke–Davis then was owned by Warner Lambert. Pfizer and Warner–Lambert, Pfizer: the world's largest research-based pharmaceutical company, http://www.pfizer.com/about/history/pfizer_warner_lambert.jsp ("Pfizer's website") (last visited Mar. 11, 2010).

33. 1480 Tr. 249. Pfizer acquired Warner–Lambert and, thus, Parke–Davis, in June 2000. Pfizer's website (last visited Mar. 11, 2010).

34. DX 2.

35. PX 13–14, 64, 307, 443.

36. PX 16–18, 21.

the next three years.[37] The Pfizer Contract contains a "key man clause" which states: "The following shall constitute events of termination ('Event of Termination'): departure or reassignment of Dr. Chuck Beard and / or Dr. Michael Kates unless Pfizer and CB agree to a replacement."[38] Upon the occurrence of an Event of Termination, the nonresponsible party could terminate the Contract immediately.[39]

Blize participated in the negotiations of the Pfizer Contract on behalf of Pfizer. He reviewed a draft of the Contract and specifically discussed with his assistant the inclusion of Kates in the key man clause.[40] During the negotiation of the Pfizer Contract, Blize was receiving paychecks from both ASDI and Pfizer, as he had accepted a job at ASDI in July 2002, but did not leave Pfizer until December 23, 2002.[41]

Despite evidence indicating that CB's work for Pfizer was not only satisfactory, but consistently exceeded the performance required under the Contract, Pfizer began pressuring CB to reduce the prices called for in the Contract almost immediately after it went into effect.[42] Pfizer also expressed concerns about CB in terms of its allegedly questionable business ethics and reputation as a "sweat-shop."[43]

In addition to its work under the Pfizer Contract, CB routinely performed one-off custom synthesis work for a variety of customers. Over time, certain customers provided so much repeat business for CB that CB came to expect recurring business from these customers.[44]

CB also maintained a catalog business through which customers could buy desired quantities of ready-made compounds for immediate delivery. CB based its catalog on a "tree concept." CB had seven core intermediate compounds (which it called the "magnificent seven") that served as trees. From these trees, CB chemists would build branches by performing reactions to create more advanced chemical intermediates. CB then would list these branches for sale in its catalog. The recipes for creating branch compounds from tree compounds were called experimentals. CB's catalog business relied on the ability to produce quickly and cost-effectively large amounts of high-purity branch compounds from the tree compounds.[45] The catalog business generated sales revenue of $300,837.50 in 2003, $331,235.79 in 2004, and $315,226.20 for the first eight months of 2005.[46]

CB considered its catalog, the concepts behind it, and the experimentals used to create catalog compounds to be confidential. Both current and former CB chemists recognized that the catalog experimentals were to be kept confidential and were

37. PX 23.

38. *Id.* § 13.1.

39. *Id.* § 13.2.

40. T. Tr. 387 (Baylis–Powell); PX 22; Dep. of Linda Pezzullo ("Pezzullo Dep.") 37.

41. T. Tr. 186–87 (Blize).

42. JX 18; T. Tr. 439 (Baylis–Powell), 1060 (Beard).

43. T. Tr. 1068–69 (Beard); Individual Dep. of Andrew Cottone, III ("Cottone Indiv. Dep.")

38–39; Dep. of Matthew Lashley ("Lashley Dep.") 18.

44. PX 439; Dep. of Susan Baylis–Powell ("Baylis–Powell Dep.") 80.

45. 30(b)(6) Dep. of Andrew Cottone ("Cottone 30(b)(6) Dep.") 19, 41, 71–73, 85–86, 101, 117–33, 143–50, 175–89, 468–84, 504–07, 553–56, 576–78, 610–17.

46. DX 211–212.

not to be provided to catalog customers.[47] Similarly, while he was at Pfizer, Blize understood that CB's catalog was confidential and agreed to put a two-way confidentiality agreement in place to protect CB's intellectual property.[48] Blize further acknowledged that it would be improper for employees leaving a company to take catalog-related information such as experimentals with them.[49] In addition, under a CB standard operating procedure, if catalog materials were used for custom synthesis projects, the process used to create the custom compound would not be given to the customer.[50]

Beginning in February 2003, a year before Kates left CB and BR, Kates and Blize spoke numerous times on their cell phones.[51] On April 30, 2003, Kates made a presentation at DeSales University as a purported consultant for ASDI that contained confidential information about CB's catalog business.[52] After further conversations made it clear that Kates was interested in leaving CB, Blize inquired about Kates's interest in setting up a custom synthesis lab for ASDI.[53]

In June 2003, Kates signed a mutual nondisclosure agreement ("MNDA") with ASDI.[54] The MNDA expressly notes that each party to the agreement "may disclose its Confidential Information to the other" in the course of exploring a business opportunity.[55] In connection with the execution of the MNDA, Blize told Kates that he would need to make a presentation to ASDI's board of directors, which consisted of Blize and Ronald and Oksana Paloni, before he could receive funding for a custom synthesis lab.[56] Kates made a presentation to ASDI's board sometime in December 2003 and was told he needed to push a catalog of compounds onto the market.[57] At one point during the presentation, Blize allegedly stopped Kates to inquire whether Kates's presentation contained confidential information regarding CB's catalog.[58] The record does not indicate the exact content of Kates's reply, but Blize testified that he would have "thrown [Kates] out the building" if he had known Kates's presentation contained CB experimentals.[59]

Satisfied that Kates could run a profitable custom synthesis lab based on his

47. Dep. of Stephen Jones ("Jones Dep.") 93–94; Dep. of Carl Edgar Whittle ("Whittle Dep.") 91–92; Lashley Dep. 73, 79; T. Tr. 562 (Cottone).

48. PX 16, 123.

49. T. Tr. 233.

50. *Id.* at 563–65 (Cottone). Cottone acknowledged one instance, however, where an experimental was released to a customer, but this occurred on a project headed by Defendants Wagaman and Smith in February 2004, immediately before they left CB for ASG. *Id.* at 564–65.

51. *Id.* at 429–30 (Baylis–Powell), 656 (Kates). Around this same time, Kates stopped submitting his cell phone bills to CB for reimbursement. *Id.* at 427 (Baylis–Powell).

52. PX 27; T. Tr. 662–63 (Kates).

53. T. Tr. 677 (Kates). Blize offered to talk to Paloni on Kates's behalf about whether Paloni could offer Kates a job. Blize Dep. 139–40.

54. T. Tr. 674–75 (Kates).

55. PX 28. Although PX 28 is a copy of the MNDA Wagaman signed, Kates admittedly signed an identical MNDA. T. Tr. 674–75 (Kates).

56. T. Tr. 217 (Blize).

57. Dep. of Michael Kates ("Kates Dep.") 180. This presentation is the subject of the spoliation inference this Court previously granted. *Beard Research, Inc. v. Kates*, 981 A.2d 1175, 1194 (Del.Ch.2009).

58. T. Tr. 230–31 (Blize).

59. *Id.* at 233.

presentation, ASDI created ASG on December 19, 2003.[60] ASDI paid over $1 million to finance the start-up of ASG's operations, which included fitting out ASG's lab space in Newark, Delaware with sophisticated and expensive machinery, and also provided management services to ASG.[61]

On January 6, 2004, Kates tendered his resignation to CB, effective March 31, but actually resigned from CB and permanently left the company on February 13, 2004.[62] By resolution passed by written consent of BR's stockholders and directors on February 18, 2004, Kates was removed as a director and officer of BR, effective February 13, 2004.[63]

On January 5, 2004, Smith, who was then CB's Director of Chemistry, signed an MNDA with ASDI identical to the one Kates had signed.[64] Later in January, Smith prepared and faxed to Blize at ASDI a lab plan design for the ASG lab in Newark.[65] While still employed at CB, Smith attempted to recruit Wagaman and Andrew Cottone, a senior group leader at CB, to come with him to ASG.[66] Smith told Cottone that ASG was going to get a contract with Pfizer, while CB's contract with Pfizer would be cancelled and CB would have to shut down, and that ASG would sell Pfizer the same catalog compounds CB was selling at lower prices.[67] Smith resigned from CB on March 26, 2004.[68] From 2003 until the end of his employment with CB, Smith asked Cottone and others at CB for information regarding CB's experimentals and other CB confidential information. Specifically, Smith asked for information about experimentals related to key starting materials and a database of CB customer information. Smith also requested that a centralized database of all CB catalog experimentals be put on CB's server.[69]

At trial, Wayne Whittaker, a former ASDI employee, testified that he repeatedly overheard Kates, Blize, and Paloni talking and laughing about how they were going to take business, including the Pfizer Contract, away from CB. Blize frequently discussed his desire to take the Pfizer Contract from CB and how he believed he could use his contacts at Pfizer to accomplish this, while Paloni indicated he intended to "bury" CB. In addition, Kates instructed Whittaker to put a folder of vendors taken from CB and certain computer disks into a safe and "guard [them] with [his] life." [70]

Kates began work for ASG on February 16, 2004. On February 27, Kates sent Mike Clark of Pfizer a proposal for an FTE contract.[71] Kates considered it fundamental to ASG's business that he obtain a contract with Pfizer and believed that funding from ASDI might dry up quickly if he could not secure a contract with Pfiz-

**60.** PX 32.

**61.** T. Tr. 49 (Smith), 217 (Blize), 683–84 (Kates); DX 57.

**62.** PX 30–31.

**63.** DX 186.

**64.** PX 34.

**65.** T. Tr. 33–34 (Smith).

**66.** *Id.* at 23 (Smith).

**67.** *Id.* at 511–12 (Cottone).

**68.** PX 36.

**69.** T. Tr. 432 (Baylis–Powell), 498–501, 636–37 (Cottone); PX 446.

**70.** T. Tr. 310–20 (Whittaker). Whittaker did not know what information the computer disks contained. *Id.* at 317.

**71.** PX 39–40.

er.[72] On March 18, 2004, Clark sent Kates a draft contract for FTE and one-off work.[73] Pfizer and ASG executed this contract on April 5 and 6, 2004. The contract provided that Pfizer would pay ASG $155,000 per FTE per year for a minimum of six FTEs and purchase one-off work, as well, though the contract did not provide for a guaranteed minimum amount of one-off work, as CB's Pfizer Contract did.[74]

On February 25, 2004, Beard informed Pfizer of Kates's departure from CB. On March 30, Alan Proctor, a high-ranking Pfizer executive, wrote Beard to advise him that Pfizer was considering invoking the key man clause to terminate the Pfizer Contract. Proctor noted that Pfizer was willing to at least meet with CB and listen to CB's proposal for Kates's replacement before terminating the Contract, but also stated that this meeting would in no way waive Pfizer's right to terminate the Contract under the key man clause.[75]

In early April 2004, CB informed Pfizer that it was offering Ving Lee as a replacement for Kates under the key man clause.[76] Notes dated April 6 written by Mark Creswell, a Pfizer outsourcing coordinator, in preparation for the meeting with CB, express concern regarding trust issues with CB and the possibility that other employees would follow Kates out the door. Creswell also outlined three strategies Pfizer was considering for dealing with CB: (1) terminating the Contract immediately; (2) terminating the Contract at the end of the year; and (3) winding down the Contract. Creswell's notes suggest that Pfizer settled on a strategy of eliminating all CB one-off work immediately and reducing the number of FTEs it would pay CB for each quarter until FTEs were eliminated completely at the end of 2004.[77]

On April 13, 2004, a number of Pfizer employees, including Clark, Creswell, and Jola Nowakowski, who took over Blize's responsibilities after he left Pfizer, visited ASDI and ASG's facilities in Delaware.[78] The next day, Clark, Creswell, and Nowakowski met with a team from CB at Pfizer's offices in Connecticut. The tenor of the meeting was hostile to CB, as highlighted by Pfizer threatening to cancel the Contract completely if CB did not agree to an amended contract. In connection with that threat, Clark specifically mentioned the key man clause. The resultant amended contract, which terminated the original Pfizer Contract, eliminated CB's one-off work and decreased the number of its FTEs to zero by the end of 2004. Pfizer also gave short shrift to Beard's offer to use Lee as a replacement for Kates under the Contract.[79]

Yet, even after Pfizer terminated the Contract, it continued to give CB one-off work and thought highly of CB's performance.[80] Indeed, when Pfizer launched an

---

**72.** T. Tr. 684–85 (Kates).

**73.** PX 155.

**74.** PX 45.

**75.** PX 162.

**76.** PX 165; T. Tr. 1069 (Beard), 1082 (Lee). Lee received a PhD in chemistry from the University of Illinois in 1975 and spent the next thirty-five years working in chemistry labs, primarily in the area of discovery and development chemistry. Lee has seventy-five publications and over sixty patents to his name. PX 168; T. Tr. 1079–80 (Lee).

**77.** PX 48.

**78.** PX 49.

**79.** T. Tr. 435–38 (Baylis–Powell), 514–17 (Cottone), 1070–71 (Beard); DX 64; Cottone Indiv. Dep. 37.

**80.** PX 64.

initiative to rely more heavily on foreign CROs, CB was one of the few American CROs to which it continued giving business.[81]

In 2004, ASG launched a catalog similar to CB's that featured many of the same compounds that CB offered in its catalog.[82] Pfizer terminated the six FTEs it contracted for with ASG for performance reasons effective January 1, 2005, but continued to give ASG one-off work through at least the middle of 2005.[83] Pfizer purchased $174,760 worth of compounds through ASG's catalog. These compounds not only were in CB's catalog, but before ASG started selling them, the compounds appeared only in CB's catalog and sold for roughly three times the price ASG charged.[84] ASG and ASDI also sold compounds that were in the CB catalog at one-third of CB's prices to other customers besides Pfizer.[85]

ASG and ASDI bought large quantities (1 kilogram or greater) of CB's so-called "magnificent seven," the seven core compounds that served as CB's trees, from R & D Chemicals. ASG and ASDI also required R & D Chemicals to sign a confidentiality agreement under which it agreed to protect ASG and ASDI's confidential information in connection with R & D Chemicals' manufacture of those core compounds.[86]

A vast array of CB documents and materials ended up at ASG's lab, including: electronic versions of experimentals, slide presentations, CB's customer list, documents showing raw material costs, analytical information, templates for proposals, and a bottle of a key chemical intermediate (which had a CB label on it).[87] ASG incorporated slides taken from CB in presentations it made to potential customers and used CB's customer list to solicit customers.[88] ASG also created a database of structures and experimentals from documents that Kates brought with him from CB.[89]

On September 1, 2005, CB sold all of its assets to Adesis, a company owned in equal shares by Beard, Cottone, and Lee, for $3.4 million.[90] The reason for this sale was, primarily, to re-focus the company's business on a different type of chemistry work, "earlier stage discovery medicinal chemistry," and re-brand the company to correspond with this new focus.[91] Beard also noted that the sale was made, at least in part, to take his name off the company, as his "reputation had been compromised." [92]

81. Dep. of Michael T. Clark ("Clark Dep.") 234–37.

82. PX 53. ASG first advertised its catalog in May 2004. PX 179. Compounds were not sold through the catalog until August 2004, however. PX 189.

83. PX 207; T. Tr. 802 (Kates).

84. PX 57, 258; T. Tr. 529 (Cottone); Beard Dep. 657, 664–65, 742.

85. PX 257, 321; T. Tr. 532 (Cottone). For example, Alfa Aesar purchased from ASG $382,360 worth of compounds that were available in CB's catalog. PX 242.

86. T. Tr. 544–46 (Cottone); PX 84, 186.

87. T. Tr. 40–45, 61–62 (Smith), 155, 174 (Jones), 702–12 (Kates); PX 345–46, 382, 394, 410.

88. PX 50–51, 121, 238, 250; Kates Dep. 447–52.

89. Pezzullo Dep. 88–90.

90. DX 87; Baylis–Powell Dep. 156–57.

91. Dep. of Ving Lee 85–86.

92. T. Tr. 1046 (Beard).

## C. Procedural History

Plaintiffs filed their initial Complaint on May 4, 2005 and amended it on September 15, 2005 to add Pfizer as a Defendant. On May 23, 2006, Plaintiffs filed a Second Amended Complaint. After Pfizer brought a counterclaim against Plaintiffs, Plaintiffs and Pfizer agreed to settle their claims. I entered a partial stipulation of dismissal whereby Plaintiffs and Pfizer dismissed their claims against each other on November 9, 2007.

On September 30, 2008, Defendants moved for summary judgment. On October 7, 2008, Defendants filed a separate motion to exclude the testimony of Plaintiffs' damages expert, Scott Jones. By Order dated March 31, 2009, I denied Defendants' motion for summary judgment in all respects. In that Order, I also denied the motion to exclude Jones's testimony, but without prejudice to Defendants' ability to renew their challenge to his testimony in their post-trial briefing, which Defendants have done.

On October 6, 2008, Plaintiffs moved for sanctions for spoliation of evidence against Kates, ASDI, and ASG. After considering the parties extensive briefing and argument on this motion, I informed them at the March 4, 2009 pre-trial conference that I intended to grant Plaintiffs' motion for sanctions against Kates, ASDI, and ASG. I memorialized that decision in a Memorandum Opinion dated May 29, 2009 (the "Spoliation Opinion").[93] In the Spoliation Opinion, I held that Plaintiffs are entitled to an adverse inference against Kates, ASDI, and ASG that Kates's December 2003 presentation to the ASDI board included a "replicate" of the CB catalog.[94] I also expressed a willingness to consider whether the facts warrant additional adverse inferences following the completion of post-trial briefing and argument.[95]

I conducted a five-day trial of this matter from March 9 to 13, 2009. After the parties submitted their post-trial briefs, I heard their final oral arguments on December 3, 2009.

## D. Parties' Contentions

Plaintiffs contend that they have proved the elements of all four of their claims and should be awarded compensatory damages in excess of $15 million. Plaintiffs accuse all of the Defendants of misappropriating their trade secrets, namely, CB's tree-based catalog system and catalog experimentals, and claim that the misappropriation was willful and malicious, entitling them to exemplary damages and attorneys' fees. According to Plaintiffs, the evidence also shows that Kates breached his fiduciary duties to CB and BR and that ASDI, ASG, and Blize aided and abetted these breaches. Plaintiffs further contend that all Defendants tortiously interfered with CB's Pfizer Contract, or, alternatively, with CB's prospective business relations with Pfizer. Finally, Plaintiffs assert that all Defendants tortiously interfered with Plaintiffs' prospective business relations with their one-off and catalog customers.

Defendants respond that Plaintiffs have failed to prove any of their claims. Defendants aver that Plaintiffs have not shown that any of their information meets the statutory requirements for trade secret protection or that any of this information was misappropriated. Defendants deny that Kates owed any fiduciary duties to CB or BR and argue that, even if he had any such duties, he did not breach them.

93. *Beard Research, Inc. v. Kates,* 981 A.2d 1175 (Del.Ch.2009).

94. *Id.* at 1193–94.

95. *Id.* at 1194.

Defendants further assert that Pfizer never breached its contract with CB and, thus, Plaintiffs cannot prove their tortious interference with contract claim. According to Defendants, Plaintiffs' tortious interference with prospective business relations claim also fails because they did not prove that they had any reasonable expectation of future business from their one-off and catalog customers. Finally, Defendants contend that the analysis of Plaintiffs' damages expert is so deeply flawed and unreliable that Plaintiffs have failed to show they are entitled to any damages whatsoever.

## II. ANALYSIS

### A. Misappropriation of Trade Secrets

■■■ Plaintiffs accuse all Defendants of misappropriating several of their trade secrets in violation of the Delaware Uniform Trade Secrets Act ("DUTSA" or the "Act").[96] Under Delaware law, an employer's trade secrets are a protectable interest.[97] To maintain a successful claim for misappropriation of trade secrets, a plaintiff must show both the existence of a trade secret and its misappropriation. DUTSA defines a "trade secret" as:

> [I]nformation, including a formula, pattern, compilation, program, device, method, technique or process, that:
>
> a. Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other

persons who can obtain economic value from its disclosure or use; and

> b. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.[98]

Accordingly, to qualify as a "trade secret" information must both derive independent economic value from not being generally known or readily ascertainable and be subject to reasonable efforts to maintain its secrecy.[99]

DUTSA defines misappropriation, in relevant part, as:

> a. Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
>
> b. Disclosure or use of a trade secret of another without express or implied consent by a person who:
>
> 1. Used improper means to acquire knowledge of the trade secret; or
>
> 2. At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade [secret] was:
>
> A. Derived from or through a person who had utilized improper means to acquire it;
>
> B. Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
>
> C. Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use[.][100]

**96.** 6 Del. C. §§ 2001–2009.

**97.** *Nucar Consulting, Inc. v. Doyle*, 2005 WL 820706, at *5 (Del.Ch. Apr. 5, 2005), *aff'd*, 913 A.2d 569 (Del.2006).

**98.** 6 Del. C. § 2001(4).

**99.** *See Dionisi v. DeCampli*, 1995 WL 398536, at *11 (Del.Ch. June 28, 1995), *amended by* 1996 WL 39680 (Del.Ch. Jan. 23, 1996).

**100.** 6 Del. C. § 2001(2). Under DUTSA, " 'improper means' shall include theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." *Id.* § 2001(1).

The plaintiff bears the burden of proving both the existence and misappropriation of a trade secret.[101] DUTSA does not require, however, any showing that a former employee had a written employment contract or nondisclosure or noncompetition agreement to prove liability for misappropriation of a trade secret.[102]

Defendants argue that Plaintiffs failed to identify any of their alleged trade secrets with the requisite particularity. There is something to be said for Defendants' position, as Plaintiffs were less than crystal clear in identifying the information they contend qualifies as a trade secret. Nevertheless, Plaintiffs did identify several categories of alleged trade secret information. I turn, therefore, to the task of determining whether any of these items are trade secrets within the meaning of DUTSA.

Plaintiffs make a serious effort to prove that two categories of information constitute trade secrets.[103] The first is the compilation of information CB used to operate its catalog business (the "CB Tree–Based Catalog System"). The CB Tree–Based Catalog System is the information needed to set up and operate a catalog business in a fashion mimicking the successful way CB ran its catalog business. This information includes the identity of the seven key intermediate compounds that comprise the magnificent seven, the tree concept of creating numerous saleable compounds from a group of key intermediates, the strategy of having large volumes of key intermediates on hand from which a large number of other compounds can be made quickly and effectively, the experimentals, or recipes, from which large quantities of the magnificent seven and other catalog compounds can be made (the "CB Catalog Experimentals," collectively with the CB Tree–Based Catalog System, the "CB Trade Secrets"),[104] and the plan that laid out which compounds CB hoped to include in its catalog in the future.[105] I note that it is not necessarily the individual elements of this compilation of information that potentially constitute trade secrets, but rather all of these elements taken together. The one exception is CB's Catalog Experimentals. I find that these experimentals, taken on their own, also constitute compilations of information potentially warranting trade secret protection.

101. *Miles Inc. v. Cookson Am., Inc.*, 1994 WL 676761, at *9 (Del.Ch. Nov. 15, 1994); *Marsico v. Cole*, 1995 WL 523586, at *4 (Del.Ch. Aug. 15, 1995). An alternative formulation of the showing a plaintiff must make requires proof of: (1) the existence of a trade secret; (2) plaintiff's communication of the trade secret to the defendant; (3) an express or implied understanding between plaintiff and defendant that the secrecy of the matter would be respected; and (4) defendant's improper use or disclosure of the trade secret to the plaintiff's detriment. *Great Am. Opportunities, Inc. v. Cherrydale Fundraising, LLC,* 2010 WL 338219, at *16 (Del.Ch. Jan. 29, 2010) (citing *Wilm. Trust Co. v. Consistent Asset Mgmt., Inc.*, 1987 WL 8459, at *3 (Del.Ch. Mar. 25, 1987)).

102. *Triton Const. Co. v. E. Shore Elec. Servs., Inc.*, 2009 WL 1387115, at *20 (Del.Ch. May 18, 2009), *aff'd*, 2010 WL 376924 (Del. Jan. 14, 2010) (citing *Wilm. Trust*, 1987 WL 8459, at *3).

103. While Plaintiffs also claim that CB's customer list is a trade secret, they failed to prove that this list is anything more than a *compilation of business cards containing contact information* or that such information is not readily ascertainable by proper means. PX 96. Thus, I find that CB's customer list does not qualify as a trade secret. *See Del. Exp. Shuttle, Inc. v. Older,* 2002 WL 31458243, at *16–19 (Del.Ch. Oct. 23, 2002).

104. PX 25.

105. DX 13. While Plaintiffs expend some effort attempting to prove that this catalog plan document is, on its own, a trade secret, I find that they failed to meet their burden of proof in that regard.

As suggested in their reply brief, Plaintiffs do not seriously contend that the 2002 catalog plan document, in and of itself, is a trade secret. Rather, Plaintiffs point to the CB catalog plan as one manifestation of the fact that their catalog is based on a tree concept. The idea was to carefully research and select key trees, i.e., "core compounds," which the CB chemists discovered could be used as starting materials for many more compounds or branches. CB invested a great deal of time and energy into making large quantities of seven or eight key intermediates. Since 1998, at least eight people with CB worked on the development of the catalog compounds, including Defendants Jones, Kates, Smith, and Wagaman. CB's business strategy was to be first in the marketplace with such a catalog and to stock its shelves fully with the compounds it advertised from day one. The December 2003 CB catalog contained 106 compounds, and the May 2004 catalog contained 114. Plaintiffs contend that the CB catalog and, in particular, the key intermediates it contains and the recipes or experimentals for making those and other related compounds in quantities of a kilogram or more, represent a compilation of information that derives independent economic value from not being generally known to, and not being readily ascertainable by proper means by, its competitors, including Defendants ASDI and ASG.[106] To support their position, Plaintiffs rely on the testimony of a process chemistry expert, Dr. Edward Grabowski. Because Defendants challenge the admissibility and

reliability of Grabowski's testimony, I turn to that issue next.

### 1. Admissibility of Dr. Edward Grabowski's testimony

Before analyzing whether Plaintiffs have proven their misappropriation of trade secrets claims, I must address several challenges to the admissibility of the testimony of their technical expert, Grabowski. Defendants seek to exclude all or part of Grabowski's testimony on the grounds that it is (1) outside the scope of his expert reports and (2) unreliable and, therefore, inadmissible under Delaware Rule of Evidence 702 and *Daubert*.[107]

Defendants seek to exclude Grabowski's testimony regarding whether any of Plaintiffs' information constitutes a trade secret or was misappropriated to the extent it went beyond the contents of his expert reports. In terms of misappropriation, Defendants' protest misses the mark. A party is only required to "state the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion."[108] Both of Grabowski's expert reports focus on issues related to misappropriation; thus, Plaintiffs gave proper notice of his testimony on that issue.[109] Additionally, at least some of Grabowski's testimony falls within the category of rebuttal testimony on misappropriation, which would be admissible because the scheduling orders in this case did not require, or even address, the submission of rebuttal expert reports.[110]

---

**106.** Defendants' expert, Dr. William D. Kingsbury, conceded it would take three to four weeks of experimentation to scale up a compound from a milligram to 100 grams. Thus, scaling up 100 compounds would require 300–400 weeks of effort. T. Tr. 1002–05 (Kingsbury).

**107.** *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

**108.** Ct. Ch. R. 26(b)(4)(A)(i).

**109.** PX 53.

**110.** D.I. 158, 282, 324. To save time at trial, the Court allowed Grabowski to give his re-

■ Defendants' objections to Grabowski's testimony on the existence of trade secrets require more attention. In his first expert report, after discussing the vast universe of chemical compounds, Grabowski compared the ASG and CB catalogs and offered his opinion on the likelihood that the significant overlap between them could be coincidental. Grabowski's second expert report concentrated on whether certain ASG experimentals were stolen from CB. Notably, Grabowski's first report, which Plaintiffs claim addresses the issue of trade secrets, never uses the words "trade secret." [111] Indeed, only two statements from Grabowski's expert reports explicitly relate to the existence of trade secrets. His first report states that "[t]he choice of compound sub-classes and the specific examples selected give the CB catalog strong measures of individuality and uniqueness." [112] A fact finder reasonably could infer from Grabowski's opinion that the CB catalog derives value from the uniqueness of its elements and that its contents, collectively, are not readily ascertainable. Even construing the statement in this fashion is a stretch, however, and I am not willing to say that it put Defendants on notice that Grabowski would testify regarding the value of specific elements of CB's information or whether specific information is readily ascertainable. Instead, I will admit and credit Grabowski's testimony on the existence of trade secrets only as it relates to the compilation

of information that comprises CB's Tree-Based Catalog System. In his second report, Grabowski states that "detailed experimental procedures … are certainly proprietary and confidential to the company that develops them, and are valuable trade secrets to that company." [113] I find that Grabowski's disclosures on this topic are sufficient to make his trial testimony admissible for the limited point that the compilation of the information needed to create the CB catalog, which includes the CB Catalog Experimentals, is valuable and not readily ascertainable. [114]

■ Defendants also contend that Grabowski's testimony should be excluded in its entirety under Delaware Rule of Evidence 702 and *Daubert.* Rule 702 states:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

As first enunciated by the U.S. Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* [115] and later adopted by the

buttal to the anticipated testimony of Defendants' technical expert, Kingsbury, before Kingsbury took the stand. Defendants did not object to this procedure.

**111.** PX 53.

**112.** *Id.*

**113.** *Id.*

**114.** To the extent footnote 8 of Plaintiffs' Reply Brief seeks to introduce statistical analysis

to shore up Grabowski's testimony as to the odds that someone independently would select all seven compounds in the magnificent seven as the building blocks of a catalog, this evidence was not disclosed before the reply brief or in conjunction with any expert report and, therefore, is not admissible.

**115.** 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

Delaware Supreme Court in *M.G. Bancorporation v. Le Beau*,[116] D.R.E. 702 imposes a special obligation on a trial judge to make sure that all expert testimony is not only relevant, but also reliable.[117] "The proponent of the expert testimony bears the burden of establishing its relevance, reliability, and admissibility by a preponderance of the evidence."[118]

Plaintiffs assert that Defendants waived any *Daubert* challenge to Grabowski's testimony by failing to raise this challenge during either the pretrial proceedings or the trial itself. While the Court serves an important gatekeeping function under *Daubert*, a party challenging expert evidence on *Daubert* grounds must do so in a timely fashion.[119] In this case, I find merit in Plaintiffs' objection to Defendants' *Daubert* challenge to the extent it relates to the opinions stated in Grabowski's expert reports. Thus, Defendants have waived their *Daubert* challenge to anything contained in these reports.

As to the rest of Grabowski's testimony, Defendants contend it is unreliable for three reasons. First, Defendants assert that Grabowski could not remember whether he had done his own analysis of the overlap between the ASG and CB catalogs or relied on Cottone's allegedly faulty mark-up of the CB catalog.[120] Second, Defendants contend that the main thrust of Grabowski's testimony, that there is almost no possibility that the high amount of overlap between the ASG and CB catalogs resulted from chance, rests on statistics rather than chemistry and is, thus, outside the realm of Grabowski's expertise. Third, Defendants decry the absence of support for Grabowski's assertion that the overlap between the catalogs was the result of misappropriation.

As to Defendants' first point, Grabowski testified that he personally compared the ASG and CB catalogs and found ninety-five matching compounds.[121] Regarding the second point, I appreciate that Grabowski is not a statistician and will consider his opinions regarding the nature of the overlap between the ASG and CB catalogs as those of a chemist and weigh it accordingly. Lastly, I disagree with Defendants' third point and view Grabowski's testimony, taken as a whole, as evidence of potential misappropriation, rather than merely a conclusion that there was misappropriation. When viewed in this light, Grabowski's testimony is entirely appropriate. Accordingly, I decline to exclude any of Grabowski's testimony on *Daubert* grounds, but, rather, will consider his testimony in connection with the purposes for which it was offered and in light of any flaws in the testimony that may have been exposed through cross-examination.[122]

116. 737 A.2d 513 (Del.1999).

117. *Id.* at 522.

118. *M & G Polymers USA, LLC v. Carestream Health, Inc.*, 2009 WL 3535466, at *5 (Del.Super. Aug. 5, 2009) (citing *Minner v. Am. Mortgage & Guar. Co.*, 791 A.2d 826, 843 (Del.Super.2000)).

119. *See Standard Distrib., Inc. v. Hall*, 897 A.2d 155, 157–58 (Del.2006); *Lithuanian Commerce Corp. v. Sara Lee Hosiery*, 202 F.Supp.2d 371, 378 (D.N.J.2002); *Questar Pipeline Co. v. Grynberg*, 201 F.3d 1277, 1289–90 (10th Cir.2000) ("A party may waive the right to object to evidence on *Kumho* [*Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) ]/*Daubert* grounds by failing to make its objection in a timely manner").

120. Kingsbury testified that thirty-seven ASG compounds that Cottone labeled as being part of the CB catalog were not actually in the CB catalog. T. Tr. 973–78; DX 243.

121. T. Tr. 842–43.

122. *See Trs. of Chi. Painters & Decorators Pension, Health & Welfare, & Deferred Sav. Plan Trust Funds v. Royal Int'l Drywall & Decorating, Inc.*, 493 F.3d 782, 788 (7th Cir.

## 2. Existence of trade secrets

### a. Independent economic value from not being known or readily ascertainable

■ For information to be classified as a trade secret it must "derive[ ] independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use."[123] Regarding the CB Tree–Based Catalog System, Defendants attempt to counter Plaintiffs' assertion that this requirement is met by doing little more than attempting to show that individual elements of the system are available in the literature. Specifically, Defendants contend that the general tree concept,[124] all of the individual compounds in the magnificent seven,[125] and experimentals for the preparation of certain CB compounds can be found in the literature,[126] and that the catalog itself revealed the exact classes of compounds with which CB was working.[127]

Defendants' arguments regarding the CB Tree–Based Catalog System miss the mark. To start, while all of the individual compounds in the magnificent seven can be found in the literature, the compilation of these seven specific compounds to form the platform for a successful catalog of more than 100 compounds is not disclosed in the literature.[128] For example, while the magnificent seven all can be purchased through CB's catalog, nothing in the catalog reveals which compounds comprise the magnificent seven.[129] Also, as discussed in more detail *infra*, any experimentals for CB catalog compounds that are in the literature are for too small a scale or low a purity to be used in CB's catalog business.[130] Moreover, Defendants fail to point to anything in the literature that shows the entire CB Tree–Based Catalog System, or even a significant portion of this System. In fact, the evidence shows that CB was the first to implement a system like the CB Tree–Based Catalog System at the scale that it did and that the likelihood of a competitor independently creating a system that involved the use and sale of similar compounds was extremely low.[131] Thus, I find that the CB Tree–Based Catalog System was not known or readily ascertainable by proper means during the relevant time period.

■ Additionally, it took CB hundreds of hours to get its catalog business up and running.[132] The evidence shows that a competitor could not have generated a similar system without expending a comparable amount of time and money.[133] Therefore, the CB Tree–Based Catalog System derives independent economic value from not being generally known to or readily ascertainable by proper means by

2007) (noting that there is less of a basis to use *Daubert* to exclude testimony entirely in a bench trial because the judge can consider any shortcomings in the expert's testimony that are drawn out through cross-examination).

123. 6 Del. C. § 2001(4).

124. T. Tr. 821 (Grabowski); DX 204.

125. T. Tr. 524 (Cottone).

126. *Id.* at 865 (Grabowski).

127. *Id.* at 839 (Grabowski).

128. *Id.* at 851–52 (Grabowski).

129. DX 203.

130. T. Tr. 524–25 (Cottone).

131. *Id.* at 917–18 (Grabowski).

132. *Id.* at 520–21 (Cottone).

133. *Id.* at 837, 851–52 (Grabowski).

CB's competitors.[134]

As for the CB Catalog Experimentals, Plaintiffs acknowledge that the existence and structure of its catalog compounds could be found in the literature, but contend that the recipes for how to make these compounds at the scale and purity CB required to run its tree concept-based catalog were not.[135] Defendants dispute this assertion, claiming through their expert, Kingsbury, that experimentals for all of CB's compounds were available in the literature.[136] Almost all of the literature cited by Kingsbury, however, involves small-scale procedures with yields and purities far lower than those used by CB. Two references that were of the proper scale and purity are irrelevant here because one involves a compound that was not a part of CB's catalog, while the other post-dates the relevant time period, having been published in 2005.[137] The evidence also indicates that it would have been prohibitively expensive, if not impossible, to scale up Kingsbury's small-scale literature references to produce the required amounts of compounds in the short time in which Defendants got their catalog online.[138] While Defendants claim that chemists routinely scale up small-scale recipes and procedures from the literature to make larger quantities of compounds, the evidence Defendants cite for this proposition relates to isolated situations and, in any event, is contradicted by credible evidence brought forth by Plaintiffs.[139] For instance, Cottone testified that "there is no way to efficiently and economically run a business" by multiplying literature procedures to scale up compounds and that, in the case of one of the magnificent seven, using a direct scale-up approach would yield an explosive compound that would blow apart the flask the chemist was using.[140]

▮▮▮ In sum, Plaintiffs have proven by a preponderance of the evidence that the CB Catalog Experimentals, which consist of recipes for creating advanced compounds on a large scale at high purities, were not in the literature or otherwise generally known or readily ascertainable by proper means.[141] Because Plaintiffs similarly have shown that Defendants could not have created comparable experimentals without an expenditure of time and money similar to that put forth by CB in developing its Experimentals, I also find that the CB Catalog Experimentals derive independent economic value from not being generally known or readily ascertain-

134. *See Agilent Techs., Inc. v. Kirkland,* 2010 WL 610725, at *18 (Del.Ch. Feb. 18, 2010) (quoting *NuCar Consulting, Inc. v. Doyle,* 2005 WL 820706, at *14 (Del.Ch. Apr. 5, 2005)) ("to show independent economic value, a plaintiff need only show that 'a competitor cannot produce a comparable product without a similar expenditure of time and money.'").

135. T. Tr. 524–25 (Cottone).

136. *Id.* at 980.

137. *Id.* at 553–54 (Cottone), 1005 (Kingsbury).

138. *Id.* at 527, 554–58 (Cottone).

139. *See* PX 20.

140. T. Tr. 527, 555–57 (Cottone).

141. I further note that "Courts have uniformly rejected efforts by trade secret defendants to argue that a process is generally known or readily ascertainable by pointing to elements in the published literature only after the defendant has been exposed to the trade secret information." *Merck & Co. v. SmithKline Beecham Pharms. Co.,* 1999 WL 669354, at *19 (Del.Ch. Aug. 5, 1999). Because ASG had at least a dozen CB Catalog Experimentals in its possession, this rule has particular application here.

able.[142]

### b. Reasonable efforts to maintain secrecy

To prove the existence of a trade secret, a plaintiff also must show that the information at issue was "subject to efforts that are reasonable under the circumstances to maintain its secrecy."[143] As to this issue, the parties focus their discussion on whether CB took reasonable steps to maintain the secrecy of the CB Catalog Experimentals. In that regard, the evidence shows that chemists who worked at CB knew the Experimentals were to be kept strictly confidential.[144] In fact, throughout the industry it was generally considered inappropriate to use experimentals anywhere outside of the lab in which they were created.[145] The evidence also shows that CB had policies in place to prevent disclosure of its Experimentals to customers.[146]

Nevertheless, Defendants insist that CB failed to take reasonable precautions to protect the secrecy of its alleged trade secrets. In support of their position, Defendants emphasize that CB employees did not sign confidentiality agreements and the Experimentals themselves were not marked as confidential. This evidence, however, is insufficient to rebut CB's showing that it made reasonable efforts to maintain secrecy.[147] Defendants have not shown that the CB Catalog Experimentals were published or frequently disseminated to customers or others outside of CB. While Defendants proved that an Experimental was given to a client on one occasion,[148] that incident involved Defendants Wagaman and Smith and occurred in the months immediately preceding their departure from CB for ASG. Given these circumstances, this occurrence appears to be an isolated event and hardly suggests any general policy of disclosing Experimentals to customers. Lacking any further evidence that CB revealed its Catalog Experimentals to outsiders, I find, therefore, that CB made reasonable efforts to maintain the secrecy of its Catalog Experimentals.

The analysis is generally similar for the CB Tree–Based Catalog System, of which the CB Catalog Experimentals are an important part. CB followed a general policy of not revealing any information regarding its catalog process to clients, and its employees were aware that the information that formed the backbone of the catalog was to remain proprietary to CB.[149] It is also reasonable to infer that CB guarded the most valuable information comprising the CB Tree–Based Catalog System as closely as it guarded the CB Catalog Experimentals. Accordingly, I find that the CB Tree–Based Catalog Sys-

---

142. *See Agilent,* 2010 WL 610725, at *18.

143. 6 Del. C. § 2001(4).

144. *See supra* note 47.

145. T. Tr. 233 (Blize).

146. *Id.* at 563–65 (Cottone).

147. It is well established that the absence of employee confidentiality agreements will not necessarily defeat a trade secret claim. *Savor, Inc. v. FMR Corp.,* 2004 WL 1965869, at *7 (Del.Super. July 15, 2004); *Nilssen v. Motorola, Inc.,* 963 F.Supp. 664, 679 (N.D.Ill. 1997) ("While an express confidentiality agreement may certainly suffice to define the duty of confidentiality necessary for action under [the Act], the existence of such an agreement is not a prerequisite to such an action."); *Smith v. Dravo Corp.,* 203 F.2d 369, 376 (7th Cir.1953).

148. *See supra* note 50.

149. PX 17, 18, 37, 307; T. Tr. 563–64 (Cottone), 1042–43 (Beard); Kates Dep. 555–56.

tem was subject to reasonable efforts to maintain its secrecy.

As to both categories of CB Trade Secrets, therefore, Plaintiffs have proven that they qualify as trade secrets within the meaning of DUTSA.

### 3. Misappropriation

■ In addition to demonstrating that the CB Tree–Based Catalog System and Catalog Experimentals constitute trade secrets, Plaintiffs also must prove that Defendants misappropriated these secrets. Under DUTSA, misappropriation is defined to include acquisition, disclosure, or use of a trade secret through improper means or in conjunction with another who acquired the secret by improper means.[150] The Act also defines "improper means" to include "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means."[151] Thus, to assess Plaintiffs' trade secret misappropriation claims, I must determine whether each of the accused Defendants (ASDI, ASG, Blize, Kates, and Smith)[152] acquired, disclosed, or used the CB Trade Secrets under circumstances amounting to misappropriation.

To prove that Defendants used the CB Trade Secrets, Plaintiffs point to evidence that ASG put out a catalog that featured many of the same compounds in CB's catalog within three to six months of beginning its operations.[153] Plaintiffs adduced credible testimony that it would have been impossible for ASG to put out its catalog, which contained over 100 compounds, that quickly without using CB's trade secrets.[154] There is further evidence that ASG bought large quantities of each of CB's magnificent seven building blocks and had in its possession at least twelve identical, word-for-word copies of CB Catalog Experimentals.[155] Plaintiffs' expert also indicated that it is extremely unlikely that the amount of overlap between the CB catalog and the ASG catalog could have resulted from mere coincidence.[156] The inference Plaintiffs seek is that ASG must have used the information comprising the CB Tree–Based Catalog System, including the CB Catalog Experimentals, in creating its catalog because there is no other way to explain the overlap between the two catalogs and the speed at which ASG set up its catalog.

In response, Defendants primarily attack Cottone's stated disbelief in ASG's ability to have introduced its catalog so quickly through proper means.[157] Defen-

**150.** *See* note 100 *supra* for definition of "misappropriation" from 6 Del. C. § 2001(2).

**151.** 6 Del. C. § 2001(1).

**152.** While Plaintiffs also accuse Wagaman and Jones of misappropriating their trade secrets, they failed to produce any evidence upon which I could find Wagaman or Jones liable for such conduct.

**153.** PX 53, 179, 189; T. Tr. 528 (Cottone).

**154.** T. Tr. 527–28 (Cottone), 1080–81(Lee) (stating that it would take a minimum of a year and a half to work up 100 compounds from scratch for a catalog). There is also testimony that it took CB eight months just to create enough of the magnificent seven inter-

mediates to begin working up other compounds for its catalog. *Id.* at 519–20, 561–62 (Cottone).

**155.** *Id.* at 544–47 (Cottone); PX 53.

**156.** PX 53 (reflecting Grabowski's opinion that 95 of the 350 compounds in an ASG catalog (27 percent) are identical to compounds found in CB's catalog and that the ASG catalog only offers compounds of the same structure as those offered by CB (*i.e.*, pyridines, pyrrolidines, azaindoles, and azaquinolines)).

**157.** T. Tr. 527–28 (Cottone).

dants contend this testimony should be excluded as an impermissible expert opinion on a subject outside of Cottone's personal knowledge. I disagree. Cottone testified based on his own experience in working on the development of the CB Tree–Based Catalog System that he could not believe that a company could produce from scratch the number of compounds at the volume required for such a catalog within the time that ASG did. Cottone had sufficient experience to give that opinion. Furthermore, Defendants cannot claim surprise in that Cottone was identified by Plaintiffs as having worked on their interrogatory answers regarding this general topic, *i.e.,* the identity of Plaintiffs' trade secrets and the basis for their misappropriation claims.[158] Additionally, Cottone testified as CB's Rule 30(b)(6) witness on those and other topics.[159]

Defendants also challenge Cottone's statement based on his comment that it took CB only eight months to scale up the magnificent seven.[160] I find this argument unpersuasive. Cottone's testimony supports Plaintiffs' position in that it took CB longer to scale up the magnificent seven, which it had to do before it could start creating its branch compounds, than it took ASG to get its entire catalog online.[161]

In denying that they used the CB Catalog Experimentals, Defendants relied on evidence that each CB catalog compound can be made without using CB proprietary

chemistry.[162] While this may be true, Defendants have not produced evidence that ASG actually made its catalog compounds without using CB's Catalog Experimentals or that they could have done so as quickly and economically. In fact, the evidence shows the opposite.

Defendants also attempt to undermine Grabowski's assertion that the overlap between the ASG and CB catalogs is too great to be coincidental by claiming that a fair number of the ASG compounds Cottone marked as being in the CB catalog were not actually in the CB catalog. Yet, Cottone explained that one of the compounds in question was *no longer* in CB's catalog because it was removed when ASG put the compound in its catalog. Moreover, Cottone observed that, while some of the compounds in question were not in the CB catalog, nearly analogous compounds were in the catalog.[163] Thus, although Grabowski's opinion that 27 percent of ASG's compounds were in the CB catalog may be slightly overstated, the evidence still shows that ASG used substantial portions of CB's Tree–Based Catalog System and Catalog Experimentals to create its catalog. I find, therefore, that at least some of Defendants used the CB Trade Secrets.

The evidence also shows that ASDI, ASG, Kates, and Smith all misappropriated the CB Trade Secrets. ASDI began

**158.** PX 25.

**159.** *See* Cottone 30(b)(6) Dep.

**160.** T. Tr. 519–20, 561–62 (Cottone).

**161.** Defendants also question the accuracy of Cottone's statement because it wrongly assumes that ASG operated in the same fashion as CB (*i.e.,* listing a catalog compound only after 100 grams of that compound were prepared and ready to be shipped). I do not understand Cottone's statement to rest on

such an assumption, however. Rather, I take Cottone's remark to mean that he would not expect ASG to offer compounds in a catalog if it did not believe it could produce them in a timely fashion, which Cottone believed would require use of the CB Trade Secrets.

**162.** T. Tr. 613–15 (Cottone).

**163.** *Id.* at 624–28 (Cottone). Also, Grabowski testified that he counted the number of overlapping compounds between the ASG and CB catalogs himself. T. Tr. 842–43.

using the CB Trade Secrets when it purchased ASG and began marketing the ASG catalog compounds that were made using the CB Tree–Based Catalog System and Catalog Experimentals.[164] ASG's use is fairly obvious: it put out a catalog created, in part, through the use of the CB Trade Secrets.[165] Use of the CB Trade Secrets also can be attributed to Kates based on his position as ASG's President, his role in setting up ASG's operations, and his knowledge of the chemistry and business models of both ASG and CB.[166] I further infer that Smith used the CB Trade Secrets based on the statement in his C.V. that he was responsible for all aspects of chemistry at ASG, including personally running projects from start to finish.[167] Plaintiffs, however, have not adduced sufficient evidence to prove by a preponderance of the evidence that Blize, who was employed by ASDI and not otherwise associated with ASG beyond being a stockholder, used the CB Trade Secrets.[168]

Furthermore, Kates and Smith acquired knowledge of the CB Trade Secrets under circumstances giving rise to a duty to maintain their secrecy or limit their use. It was understood at CB and throughout the CRO industry that information such as the CB Tree–Based Catalog System and Catalog Experimentals was to be kept proprietary. CB also had a policy of not disclosing information relating to its catalog business to customers.[169] Under these circumstances, Kates and Smith, at a minimum, had reason to know that they could not take the CB Catalog Experimentals and other information that was part of the CB Tree–Based Catalog System to ASG and use these Trade Secrets there. Because Kates and Smith knew or had reason to know that they had a duty to maintain the secrecy or limit the use of the CB Trade Secrets, but used the Trade Secrets in derogation of this duty, I find them liable to CB for misappropriation of trade secrets.[170]

To find ASG and ASDI liable for misappropriation of trade secrets, I must find either that they (1) used improper means to acquire knowledge of the CB Trade Secrets, (2) knew or had reason to know, while using the CB Trade Secrets, that Kates and Smith had acquired this information through the use of improper means, or (3) derived the information from Kates and Smith when they "owed a duty to [Plaintiffs] to maintain its secrecy or limit its use."[171] Under DUTSA "improper means" includes "breach or inducement of a breach of a duty to maintain secrecy."[172] The evidence shows that Paloni funded ASG as a means to obtain a catalog business similar to CB's and pushed Kates to start a catalog business at ASG. I further infer from the evidence that ASDI's Paloni and Blize encouraged Kates to bring CB Trade Secrets to ASG when he left CB or turned a blind eye to Kates's doing so. It likewise can be inferred that

164. *Id.* at 646 (Kates).

165. PX 189.

166. JX 26; T. Tr. 757–62 (Kates).

167. PX 119.

168. PX 1; T. Tr. 224 (Blize).

169. Jones Dep. 93–94; Whittle Dep. 91–92; Lashley Dep. 73, 79; T. Tr. 233 (Blize), 562–65 (Cottone).

170. The CB Trade Secrets relate to the catalog business. Because Plaintiff BR did not have a catalog business, but rather did only FTE work, I find that Kates and Smith are liable only to CB, and not BR, for misappropriation of trade secrets.

171. 6 Del. C. § 2001(2).

172. 6 Del. C. § 2001(1).

Kates, acting as ASG's President, encouraged Smith to do the same. Thus, the evidence indicates that ASG either induced Kates and Smith to bring the CB Trade Secrets with them to ASG in derogation of their duty to CB to maintain the secrecy of this information or had reason to know what was occurring. Thus, I find that ASG is liable to CB for misappropriation of trade secrets.

As for ASDI, its situation can be analogized to that of the parent company in *Miles*.[173] In that case, the court found the parent of a company that was primarily liable for trade secret misappropriation also to be liable for misappropriation because it pushed its subsidiary to enter the market at issue (the high performance organic pigment market) and provided the funding to enter this market.[174] Here, ASDI provided the funding for ASG's operations because it was interested in launching a chemical catalog business.[175] Also, through Paloni's encouragement of Kates and funding of ASG, ASDI is just as culpable as ASG for either inducing Kates and Smith to breach their duties to maintain the secrecy of the CB Trade Secrets or simply accepting the fruits of those breaches, when ASDI had reason to know Kates and Smith were bound to keep those trade secrets confidential. Ultimately, ASDI facilitated the acquisition of the CB Trade Secrets, as it allowed an affiliate company it would later purchase, ASG, to acquire this information. Based on these circumstances, I hold that ASDI misappropriated the CB Trade Secrets within the

meaning of DUTSA. Thus, I find ASDI liable to CB for misappropriation of trade secrets.

### 4. Exemplary damages and attorneys' fees

Plaintiffs also seek an award of exemplary damages and attorneys' fees because Defendants' misappropriation of trade secrets was willful and malicious. Section 2003(b) of DUTSA states: "If wilful and malicious misappropriation exists, the court may award exemplary damages in an amount not exceeding twice any award" of actual damages.[176] Additionally, 6 Del. C. § 2004 provides that "if ... wilful and malicious misappropriation exists, the court may award reasonable attorneys fees to the prevailing party." Willfulness is "an awareness, either actual or constructive, of ones conduct and a realization of its probable consequences," while malice is defined as "ill-will, hatred or intent to cause injury." [177]

Plaintiffs aver that the "evidence in this case, including the inferences therefrom, not only demonstrates misappropriation but willful and malicious misappropriation, thus triggering ... exemplary damages, and attorneys fees." [178] Yet, Plaintiffs do not specify which evidence they believe shows that Defendants misappropriation was malicious. The only evidence of malice that I have found on the record was of the conversation in which Kates, Blize, and Paloni laughed about how they were going to take CB's contract with Pfizer and "bury" CB.[179] There is no evidence, howev-

---

173. *Miles Inc. v. Cookson Am., Inc.*, 1994 WL 676761 (Del.Ch. Nov. 15, 1994).

174. *Id.* at *19.

175. T. Tr. 49 (Smith), 184, 217 (Blize), 683–84 (Kates).

176. 6 Del. C. § 2003(b).

177. *NuCar Consulting, Inc. v. Doyle*, 2005 WL 820706, at *14 (Del.Ch. Apr. 5, 2005).

178. POB 25.

179. T. Tr. 310–20 (Whittaker). Cottone recounted a conversation where Smith made comments to similar effect. *Id.* at 511–12.

er, that the CB Trade Secrets were discussed at this meeting. Moreover, the evidence indicates that ASG was going to use Blize's contacts at Pfizer, rather than the CB Trade Secrets, to secure a contract with Pfizer, and the eventual Pfizer–ASG contract focused on FTE work, as opposed to catalog work. While there may be some evidence of Defendants malice towards Plaintiffs, there is no evidence connecting this malice to Defendants misappropriation of the CB Trade Secrets. Accordingly, neither an award of exemplary damages or attorneys fees under DUTSA is justified here.

## B. Breach of Fiduciary Duty

### 1. Did Kates breach his fiduciary duties to CB and BR?

 Under fundamental principles of agency law, an agent owes his principal a duty of loyalty, good faith, and fair dealing. These duties encompass the corollary duties of an agent to disclose information that is relevant to the affairs of the agency entrusted to him and to refrain from placing himself in a position antagonistic to his principal concerning the subject matter of his agency. An agent, however, is not prohibited from acting in good faith outside his employment even though it may adversely affect his principal's business, or from making arrangements or preparations to compete with his principal before terminating his agency, provided he does not act unfairly or injure his principal.[180] These hallmark principles of agency law apply to traditional corporate fiduciaries, such as officers and directors, and also to key managerial personnel.[181]

 A claim for breach of fiduciary duty requires proof of two elements: (1) that a fiduciary duty existed and (2) that the defendant breached that duty.[182] Incredibly, Defendants argue that Kates owed no fiduciary duties to either CB or BR. In making this claim, Defendants ignore that, as a director of BR,[183] Kates unquestionably owed fiduciary duties to BR.[184] Additionally, the evidence shows that Kates managed BR; thus, he owed fiduciary duties to BR as an officer, as well.[185] At CB, Kates held the position of Executive Vice President and was second in command, after Beard.[186] While Kates considered himself to be a part of CB's management, as did others at CB, Kates denies that he was an officer.[187] Notwithstanding Kates's view, I find, based on his title and high ranking position at CB, that Kates was both an officer and one of the key managerial personnel of CB [188] and, therefore, owed that company fiduciary duties.[189] As Kates resigned from CB and

**180.** *Sci. Accessories Corp. v. Summagraphics Corp.*, 425 A.2d 957, 962 (Del.1980) (citing Restatement (Second) of Agency §§ 381, 387, 393).

**181.** *Id.; Gantler v. Stephens*, 965 A.2d 695, 708 (Del.2009).

**182.** *ZRii, LLC v. Wellness Acq. Gp., Inc.*, 2009 WL 2998169, at *11 (Del.Ch. Sept. 21, 2009) (citing *Heller v. Kiernan*, 2002 WL 385545, at *3 (Del.Ch. Feb. 27, 2002)).

**183.** DX 186; 1480 Stip. § 2(d).

**184.** *Gantler*, 965 A.2d at 708.

**185.** Beard Dep. 746–47.

**186.** T. Tr. 403–04 (Baylis–Powell), 647–48 (Kates).

**187.** *Id.* at 404 (Baylis–Powell), 648 (Kates).

**188.** *See* PX 23 § 13.1 (designating Kates and Beard as the only two "key men" at CB).

**189.** *See also* 1480 Stip. § 2(h) (listing as an admitted fact that "At all times relevant Mike Kates was also an employee and officer of CBRD."). ASDI and Blize dispute whether this stipulation applies to them. That argument is moot, however, because even without regard to the stipulation, I find that Kates owed fiduciary duties to CB.

BR and was removed as a director and officer of BR on February 13, 2004, the nature of his fiduciary duties would have changed on that date.[190]

 A breach of fiduciary duty occurs when a fiduciary commits an unfair, fraudulent, or wrongful act, including misappropriation of trade secrets, misuse of confidential information, solicitation of employer's customers before cessation of employment, conspiracy to bring about mass resignation of an employer's key employees, or usurpation of the employer's business opportunity.[191] Defendants assert that to the extent Plaintiffs' breach of fiduciary duty claim is based on misappropriation of trade secrets, it is preempted by DUTSA. DUTSA's preemption provision states that the Act "displaces conflicting tort, restitutionary and other law of this State providing civil remedies for misappropriation of a trade secret."[192] Courts have interpreted this language to mean that DUTSA preempts claims that are "grounded in the same facts which purportedly support the misappropriation of trade secrets claims."[193] A common law claim is "grounded in the same facts" as a trade secret claim if "the same facts are used to establish all the elements of both claims."[194] In other words,

> if the success of the common law claim does not depend on the success of the trade secrets claim, that is, if a plaintiff need not prove all the facts underlying the trade secrets claim in order to prove the common law claim, then the common

law claim is not "grounded in the same facts" and is not preempted.[195]

 Plaintiffs' breach of fiduciary duty claim is not preempted here. The same facts are not required to establish all the elements of both the misappropriation and breach of fiduciary duty claims. To prove misappropriation of trade secrets, for example, a plaintiff must show that the information in question qualifies as a trade secret under 6 *Del. C.* § 2001(4). No such showing is required to prove a breach of fiduciary duty, as that claim can be premised on the misuse of a plaintiff's confidential information, even if that information does not rise to the level of a trade secret.[196] Even if Plaintiffs' misappropriation of trade secrets claim had failed, they still could show a breach of fiduciary duty by demonstrating that Kates stole and misused CB or BR's confidential information or committed any of the other wrongful acts alleged. Thus, the success of the common law claim (breach of fiduciary duty) does not depend on the success of the trade secrets claim, and Plaintiffs' breach of fiduciary duty claim is not preempted.

The evidence shows that Kates breached his fiduciary duties to CB and BR in several respects. First, even if, contrary to my previous finding, the CB Tree–Based Catalog System and the CB Catalog Experimentals were deemed not to satisfy the requirements for a trade secret under Section 2001(4), they still constitute valuable confidential information of CB. Hence, Kates's disclosure of that information to

190. PX 30; DX 186.

191. *Summagraphics*, 425 A.2d at 965.

192. 6 Del. C. § 2007(a).

193. *Ethypharm S.A. France v. Bentley Pharms., Inc.*, 388 F.Supp.2d 426, 433 (D.Del. 2005) (quoting *Savor, Inc. v. FMR Corp.*, 2001 WL 541484, at *4 (Del.Super.Apr. 24, 2001)).

194. *Accenture Global Servs. GMBH v. Guidewire Software Inc.*, 631 F.Supp.2d 504, 508 (D.Del.2009) (citing *Ethypharm*, 388 F.Supp.2d at 434–35).

195. *Id.*

196. *Summagraphics*, 425 A.2d at 965.

ASDI and ASG and unauthorized use of it breached his fiduciary duties. In addition, Kates took a large amount of other confidential information from CB and BR with him when he went to ASG (including slide presentations, a customer list, proposal templates, analytical and pricing information, a bottle of a key chemical compound, and computer disks that Whittaker was told to lock in a safe).[197] Kates also revealed confidential CB information in an April 2003 presentation he gave as an ASDI consultant at DeSales University almost a year before he left CB.[198] I also consider it appropriate to extend the spoliation inference I originally granted to find that Kates disclosed to Defendants ASDI and ASG not only the CB catalog, but also portions of the CB Tree–Based Catalog System and the CB Catalog Experimentals in or around December 2003, while Kates still worked for CB and BR. All of these instances reflect misuse of Plaintiffs' confidential information and constitute breaches of fiduciary duty by Kates.

Kates breached his fiduciary duties to CB and BR in other respects, as well. Because Smith became a shareholder of ASG and submitted a lab plan design to Blize at ASDI before Kates left CB, I infer that Kates successfully recruited Smith,

CB's Director of Chemistry and a key employee, to ASG while he owed fiduciary duties to CB and BR.[199] Also, while still employed at CB and BR, Kates had meetings with Blize and Paloni at which the trio discussed their plans to take business from CB and BR.[200] These plans included displacing CB at Pfizer and disrupting CB's Pfizer Contract. Thus, Plaintiffs have proven that while he served as an officer and key managerial member of CB and an officer and a director of BR, Kates breached his fiduciary duties by, among other things, inducing the resignation of certain of CB and BR's key employees to join a competitor and usurping CB and BR's business opportunities.[201]

### 2. Did Blize, ASDI, and ASG aid and abet Kates's breach of fiduciary duties?

 A third party may be liable for aiding and abetting a breach of fiduciary duty if the third party "knowingly participates" in the breach.[202] Knowing participation in a breach of fiduciary duty requires that "the third party act with the knowledge that the conduct advocated or assisted constitutes such a breach."[203]

ASDI and Blize undoubtedly participated in Kates's breaches of fiduciary duty.

197. T. Tr. 40–45, 61–62 (Smith), 155, 174 (Jones), 315–16 (Whittaker), 702–12 (Kates).

198. PX 27; T. Tr. 662–63 (Kates).

199. T. Tr. 33–34 (Smith), 224 (Blize); PX 35.

200. T. Tr. 310–20 (Whittaker).

201. Defendants' citation to *Lazard* as supporting a contrary conclusion is unavailing. *Lazard Debt Recovery GP, LLC v. Weinstock,* 864 A.2d 955 (Del.Ch.2004). In that case, plaintiffs claimed defendants breached their fiduciary duties solely by leaving their jobs at an inopportune time without giving notice. The court noted, however, "that if [defendants] Weinstock and Herenstein misused confidential information, they could potentially be subject to liability ... for breach of their fiducia-

ry duties" and denied defendants' motion to dismiss to the extent it sought to dismiss breach of fiduciary duty claims based on misuse of confidential information. *Id.* at 966, 967 n. 22.

202. *Malpiede v. Townson,* 780 A.2d 1075, 1096 (Del.2001) (quoting *Gilbert v. El Paso Co.,* 490 A.2d 1050, 1057 (Del.Ch.1984)); *see also Laventhol, Krekstein, Horwath & Horwath v. Tuckman,* 372 A.2d 168, 170–71 (Del.1976) ("[P]ersons who knowingly join a fiduciary in an enterprise which constitutes a breach of his fiduciary duty of trust are jointly and severally liable for any injury which results.").

203. *Malpiede,* 780 A.2d at 1097.

Blize and ASDI arranged for Kates to give a presentation to the ASDI board before Kates left CB and BR. At that presentation, Kates revealed confidential CB information. ASDI funded ASG, the vehicle to which Kates brought over a vast quantity of information in breach of his fiduciary duties to CB and BR.[204] Blize, an ASDI executive, actively encouraged Kates to set up a catalog business at ASG and informed Kates that he would need to impress the ASDI board to get funding for a new venture.[205] Blize and Paloni hosted meetings at ASDI with Kates while Kates was employed by CB and BR during which they discussed taking business, including the critical Pfizer Contract, away from CB.[206]

To prove aiding and abetting, however, Plaintiffs also must show that they knew Kates was breaching his fiduciary duty. Defendants deny that the spoliation inference that Kates disclosed confidential information during his presentation to the ASDI board shows that either Blize or ASDI knew the information Kates disclosed was confidential. In fact, they point to evidence that Blize interrupted Kates's presentation to ensure that Kates was not disclosing any CB confidential information and later stated that he would have thrown Kates out of the building had he known that Kates was revealing confidential information. Blize also denied knowing that any CB Catalog Experimentals were present at ASG before this litigation began.[207] While I am somewhat skeptical of Blize's testimony on these points, I credit it to the extent he denied knowledge of Kates's misappropriation of CB's Trade Secrets. Regarding the broader category of CB's

confidential information, I find that the actions of ASDI and Blize speak louder than their words. That is, ASDI and Blize knew or should have known that Kates was using and disclosing to ASG confidential information of CB and thereby breaching his fiduciary duties to CB. Nevertheless, neither ASDI nor Blize took any meaningful steps to ensure that ASDI and ASG did not receive or use any CB confidential information.

Kates also breached his fiduciary duties in ways unrelated to CB's trade secrets or confidential information. One such way involved Kates's scheming with Blize and Paloni to take away CB's business and the Pfizer Contract. The evidence shows that both Blize and ASDI, through Paloni, its founder and board chairman, participated in this breach. Blize and Paloni hosted meetings at ASDI's office with Kates where they discussed taking CB's business, thus knowingly participating in that aspect of Kates's breach of fiduciary duty. Moreover, while Defendants claim that Blize did not know about the key man clause in the Pfizer Contract, the evidence refutes that allegation. While still at Pfizer, Blize specifically discussed with his assistant whether Kates should be included as a key man.[208] Also, Blize and Paloni had to know that, due to his high ranking positions at CB and BR, Kates owed duties to those companies such that he could not plot to steal business from them while they still employed him. Despite this knowledge, Blize and Paloni still engaged Kates in conversations where the group plotted to steal CB's business and destroy the company, in obvious violation of Kates's fiduciary duties. Accordingly, ASDI and

---

**204.** T. Tr. 49 (Smith), 217 (Blize), 683–84 (Kates).

**205.** Blize Dep. 159; Kates Dep. 180; T. Tr. 217 (Blize).

**206.** T. Tr. 310–20 (Whittaker).

**207.** *Id.* at 230–33 (Blize).

**208.** Pezzullo Dep. 37.

Blize are liable for aiding and abetting Kates's breaches of fiduciary duties.

While Plaintiffs also accuse ASG of aiding and abetting Kates's breaches of fiduciary duty, they cite no facts tending to show that ASG knowingly participated in these breaches and the chronology suggests it did not.[209] ASG did not exist until December 19, 2003 and did not become functional in any capacity until Kates left CB.[210] Because Kates's breaches of fiduciary duty occurred before he left CB, it is unlikely that ASG played any role in them. Accordingly, I find that ASG is not liable for aiding and abetting Kates's breaches of fiduciary duty.

## C. Tortious Interference with Contractual Relations

▮▮▮▮▮ Plaintiffs also allege that all Defendants tortiously interfered with the Pfizer Contract.[211] The elements of a tortious interference with contractual relations claim are: "(1) a valid contract; (2) about which defendants knew; (3) an intentional act that is a significant factor in causing the breach of such contract; (4)

without justification; (5) which causes injury."[212]

Defendants' primary argument here is that Plaintiffs failed to prove that Pfizer ever breached the Contract and absent proof of a breach, the tortious interference with contractual relations claim must fail. Defendants have a strong argument that Pfizer had the right to terminate the Contract immediately and completely under the key man clause upon Kates's departure from CB. Thus, according to Defendants, Pfizer's decisions to force an amended Contract on CB and eventually cancel the Contract entirely, in and of themselves, do not constitute a breach.

In response, Plaintiffs contend that Pfizer breached the Contract because it failed to notify Plaintiffs that it was invoking the key man clause or give good faith consideration to Ving Lee as Kates's replacement under that clause. The record, however, disproves Plaintiffs' assertion that Pfizer failed to notify Plaintiffs of its invocation of the key man clause. Alan Proctor's March 30, 2004 letter to Beard states that Pfizer was entitled to terminate the Contract under the key man clause and

---

**209.** In fact, in the section of their opening brief entitled "Blize, ASG, and ASDI Provide Kates Incentive and Support," Plaintiffs only mention ASG once, referencing the fact that ASDI financed its startup. POB 42–44. In their reply brief, Plaintiffs said nothing about their aiding and abetting claim against ASG. Indeed, the corresponding section in the reply brief is entitled "ASDI and Blize aided and abetted Kates' breaches." Pls.' Reply Br. ("PRB") 23.

**210.** PX 32.

**211.** While Plaintiffs' brief asserts that all Defendants should be found liable for tortious interference with contractual relations, Plaintiffs failed to produce any evidence that indicates that Smith, Jones, or Wagaman is liable on this claim.

**212.** *AeroGlobal Capital Mgmt., LLC v. Cirrus Indus., Inc.*, 871 A.2d 428, 437 n. 7 (Del.2005) (citing *Aspen Advisors LLC v. UA Theater Co.*, 861 A.2d 1251, 1265–66 (Del.2004)). To resolve a dispute between the parties as to the law applicable to this claim, I hold that even though the Pfizer Contract is governed by New York law, Delaware law governs Plaintiffs' tortious interference with contractual relations claim because the alleged interference occurred in Delaware and all parties to this dispute reside in Delaware. *See Weiss v. Leewards Creative Crafts, Inc.*, 1993 WL 155493, at *4 n. 2 (Del.Ch. Apr. 29, 1993) (citing *Travelers Indem. Co. v. Lake*, 594 A.2d 38, 47 (Del.1991) ("Under Delaware law, the local law of the state with the most significant relationship to the occurrence and parties governs the rights of litigants with respect to tort claims.")).

was considering doing so.[213] Pfizer also stated at the April 14 meeting with CB that they were going to terminate the Contract under the key man clause unless CB agreed to an amended contract.[214] Accordingly, I find that Pfizer sufficiently notified CB that it was invoking the key man clause.

Plaintiffs' other argument for finding that Pfizer breached the Contract rests on the portion of the key man clause stating that Kates's departure constitutes an Event of Termination "unless Pfizer and CB agree to a replacement." [215] Plaintiffs assert that Pfizer's refusal to agree to CB's proffer of Lee as Kates's replacement amounts to a breach. But, Plaintiffs have the burden of proof on that issue and they failed to meet it. The language of the key man clause allows Pfizer to terminate the Contract unless it agrees with CB on a replacement. This language is permissive, allowing Pfizer to keep the Contract in place if CB had a suitable replacement, but not requiring Pfizer to accept any replacement that CB proposed. To establish that Pfizer breached that provision, Plaintiffs effectively would have to show that Pfizer acted in bad faith when it declined to accept Lee as a substitute for Kates.

Although I am skeptical of Pfizer's motives, the evidence does indicate that Pfizer was unhappy with the terms of the Contract, particularly the amount of money it was required to pay CB. Thus, it is reasonable to infer that CB would have faced an uphill battle in identifying a replacement that Pfizer would find acceptable.[216] Moreover, Pfizer inquired about CB's proposed replacement for Kates and appeared, at least, to consider Lee as a potential replacement at the April 14 meeting.[217] In the end, however, Plaintiffs failed to prove that Pfizer breached its obligations under the key man clause when it did not accept Lee as a replacement for Kates. Because Plaintiffs did not prove either of their proffered grounds for finding that Pfizer breached the key man clause, they have not shown that Pfizer's actions in terminating the Contract and forcing CB to accept an amended contract provide a sufficient predicate for a claim of tortious interference with contract.

Even without a breach of contract, however, Plaintiffs still contend that they have a viable tortious interference with contractual relations claim, asserting that this tort does not require a breach *per se*, but rather that a termination or substantial modification is sufficient. In support of this proposition, Plaintiffs cite *Hannigan v. Sears, Roebuck & Co.*,[218] a case decided by the Seventh Circuit in 1969. In *Hannigan*, the plaintiff owned a company that designed and distributed metal outdoor storage lockers and had a contract with Fabricated whereby Fabricated would sell the lockers it made exclusively to the plaintiff and the plaintiff would buy lockers exclusively from Fabricated. Knowing of Fabricated's arrangement with the plaintiff, the defendant threatened to stop carrying Fabricated's products unless it restructured its deal with the plaintiff. Because Fabricated's business was heavily dependent on the defendant, Fabricated told the plaintiff that unless it agreed to amend the contract, Fabricated would have to go out of business, which would leave the plaintiff with no one to make its

213. PX 162.

214. Cottone Indiv. Dep. 37.

215. PX 23 § 13.1.

216. T. Tr. 1060 (Beard).

217. PX 162; T. Tr. 517 (Cottone).

218. 410 F.2d 285 (7th Cir.1969).

lockers. Ultimately, the plaintiff agreed to an arrangement whereby Fabricated would sell lockers directly to the defendant (rather than through the plaintiff) and the plaintiff would receive a commission on each sale.[219] In finding the defendant liable for inducing a breach of contract, the court held that an outright repudiation of a contract is not a prerequisite to liability for this tort and that inducing an involuntary modification which achieves "essentially the same result" as a breach is sufficient.[220]

Plaintiffs also rely on the *Slye* case.[221] In *Slye*, the court noted in dicta that courts commonly rule that tortious interference with contractual relations has occurred when a third party's unprivileged action causes a contracting party to take an action which is permitted under the contract, but which the party otherwise would not have taken without such interference.[222]

Defendants point to the Delaware Superior Court's decision in *Luscavage* to counter Plaintiffs' cases.[223] In *Luscavage*, the court granted a motion to dismiss a complaint because plaintiffs failed to properly plead the required elements of a tortious interference with contractual relations claim. The court found it dispositive that plaintiffs had not plead the existence of a breach, but only that their contract was terminated. Specifically, the court held that "termination of a contract is not the same as breach of contract," and that "ac-

cording to Delaware law, to succeed under [a tortious interference with contract] theory, there must be an actual breach of a valid and enforceable contract."[224]

Defendants' argument is more persuasive. Both of Plaintiffs' cases are from foreign jurisdictions and can be readily distinguished. In *Hannigan*, Fabricated had no legal right to terminate or modify its contract with the plaintiff, whereas Pfizer had the right to terminate the Contract under the key man clause and purported to exercise that right. The facts of *Slye* are irrelevant to the situation before me and Plaintiffs cite that case only for its dicta, which relies in part on *Hannigan*.[225]

■ *Luscavage*, on the other hand, is a Delaware case that applies Delaware law. That case squarely holds that a tortious interference with contractual relations claim will fail under Delaware law absent an actual breach of contract and that mere termination of a contract is not sufficient to meet this requirement.[226] Because Plaintiffs have shown only that Pfizer terminated the Contract and not that Pfizer breached the Contract, they have not proven an essential element of their tortious interference with contractual relations claim. Thus, that claim will be dismissed.

## D. Tortious Interference with Prospective Business Relations

■ To prove a claim for tortious interference with prospective business rela-

**219.** *Id.* at 288–90.

**220.** *Id.* at 290–91.

**221.** *Slye v. Cent. States Se. & Sw. Areas Health & Welfare Fund*, 1997 WL 675575 (S.D.Ohio June 2, 1997).

**222.** *Id.* at *3.

**223.** *Luscavage v. Dominion Dental USA, Inc.*, 2007 WL 901641 (Del.Super. Mar. 20, 2007).

**224.** *Id.* at *2 (citing *Ariba, Inc. v. Elec. Data Sys. Corp.*, 2003 WL 943249, at *5 (Del.Super. Mar. 7, 2003)).

**225.** *Slye*, 1997 WL 675575, at *3 (citing *Hannigan*, 410 F.2d 285).

**226.** *Luscavage*, 2007 WL 901641, at *2.

tions, a plaintiff must show: (1) a reasonable probability of a business opportunity; (2) intentional interference by a defendant with that opportunity; (3) proximate causation; and (4) damages.[227] Also, this tort "must be considered in light of a defendant's privilege to compete or protect his business interests in a fair and lawful manner."[228] Plaintiffs assert that all Defendants have tortiously interfered with their prospective business relations in two separate ways.[229]

### 1. The Pfizer Contract

 First, Plaintiffs aver that the facts underlying their failed tortious interference with contractual relations claim still suffice to show tortious interference with prospective business relations. Kates's departure from CB gave Pfizer the ability to terminate the Contract at will, which, according to the Delaware Supreme Court, means the Contract is more properly characterized as an expectation that the business relation will continue.[230] The tortious interference with prospective business relations standard is arguably more favorable to a defendant than the tortious interference with contractual relations standard because, under the former standard, a court must consider the defendant's privi-

lege to compete or protect his business interests in a fair and lawful manner.[231]

Plaintiffs have shown they had a reasonable probability of a business opportunity with respect to the Pfizer Contract. The Contract was to run for another twenty months when Pfizer terminated it. Even after Kates left and enabled Pfizer to invoke the key man clause, CB reasonably could have expected that Pfizer would not terminate the Contract based on its consistently strong performance under the Contract.[232] CB enhanced the reasonableness of this belief by proposing to replace Kates with Ving Lee, who CB viewed as "infinitely better qualified in every respect than Kates."[233] Lee's excellent credentials and CB's strong performance under the Contract reasonably could have outweighed any concerns Pfizer may have had as to the cost of the Contract or CB's business ethics.[234] Thus, I find that CB had a reasonable probability of a business opportunity in terms of retaining the Pfizer Contract even after Kates left.

Defendants deny that they intentionally interfered with CB's relationship with Pfizer. Defendants assert that they merely intended to compete with CB for Pfizer's business. The evidence does not bear out this assertion, however. Rather, it indicates that Defendants acted with the spe-

---

227. *Triton Const. Co. v. E. Shore Elec. Servs., Inc.*, 2009 WL 1387115, at *17 (Del.Ch. May 18, 2009), *aff'd*, 2010 WL 376924 (Del. Jan. 14, 2010) (citing *Empire Fin. Servs., Inc. v. Bank of N.Y.*, 900 A.2d 92, 98 n. 19 (Del. 2006)).

228. *Id.* at *17 (quoting *DeBonaventura v. Nationwide Mut. Ins. Co.*, 419 A.2d 942, 947 (Del.Ch.1980)).

229. Again, while Plaintiffs assert in their brief that all Defendants are liable for this tort, Plaintiffs have failed to produce any evidence that Smith, Wagaman, or Jones tortiously interfered with Plaintiffs' prospective business relations.

230. *Empire Fin. Servs.*, 900 A.2d at 98 (holding that where defendant interfered with an at-will contract, plaintiff's conversion claim was analyzed more appropriately as a claim for tortious interference with prospective business relations).

231. *Triton*, 2009 WL 1387115, at *17.

232. T. Tr. 439 (Baylis–Powell).

233. *Id.* at 1069 (Beard).

234. *Id.* at 1060, 1068–69 (Beard).

cific intent of working with Kates to convince Pfizer to cancel the Contract and work instead with ASG.[235]

Several facts support this conclusion. Blize, who had worked for and still had connections with Pfizer, communicated with Kates on numerous occasions before Kates left CB and BR.[236] Pfizer met with ASG in Delaware, with a contract between the two already in place, the day before Pfizer forced Plaintiffs to agree to amend the Contract in material respects during a meeting with Plaintiffs at Pfizer's offices in Connecticut.[237] Defendants also offered Pfizer an FTE rate that was approximately $75,000 (or 33 percent) lower than the price Pfizer paid CB under the Contract.[238]

Some of the most compelling evidence, however, was the testimony of Whittaker regarding the comments made by the ASDI/ASG hierarchy. Whittaker stated that he overheard meetings where Blize, Kates, and Paloni talked about how they were going to take away business, including the Pfizer Contract, from CB and laughed at the prospect of accomplishing this. During one of these meetings Paloni said he was going to "bury" CB. Also, Blize told Whittaker on several occasions of his desire to use his contacts at Pfizer to take the Contract from CB.[239]

Defendants urge the Court to disregard Whittaker's testimony as that of a disgruntled former employee. Defendants claim that Whittaker knew little about ASG's business operations and was not a partici-

pant in the meeting where he allegedly heard Defendants' comments about taking CB's business. Yet, Whittaker's knowledge of ASG's business is irrelevant here, as the comments at issue do not involve any technical details about the business of either ASG or CB. Also, Whittaker testified that he was within earshot of the meeting and heard everything that was going on, even though he was not a participant. In addition, Blize told Whittaker on a separate occasion of his desire to take the Pfizer Contract from CB.[240] Thus, having heard Whittaker's testimony at trial, I find it credible and supportive of my finding that Defendants intended to interfere with CB's Pfizer Contract.

 In Delaware, proximate cause is "that direct cause without which the [incident] would not have happened."[241] In this case, Defendants ASDI and Blize actively recruited Kates away from CB by offering him his own fully-funded lab and, thus, created a situation in which Pfizer could terminate the Contract.[242] The record shows Defendants always viewed Kates as an integral part of their plan. Further, ASG offered Pfizer a contract with a much lower FTE rate than CB's Contract for the purpose of undercutting CB's contract and making CB's rates look unattractive.[243] Plaintiffs also claim that Defendants, including Kates, poisoned the well at their April 13, 2004 meeting with Pfizer, which occurred one day before the Pfizer–CB meeting at which Pfizer termi-

**235.** *Id.* at 310–13 (Whittaker), 511–14 (Cottone).

**236.** *Id.* at 429–30 (Baylis–Powell), 656 (Kates).

**237.** PX 49; T. Tr. 435–38 (Baylis–Powell), 514–17 (Cottone).

**238.** PX 23, 45.

**239.** T. Tr. 310–20 (Whittaker).

**240.** *Id.* at 312–13 (Whittaker).

**241.** *Finocchiaro v. D.P., Inc.,* 2006 WL 3873257, at *6 (Del.Super. Dec. 29, 2006).

**242.** T. Tr. 215–17 (Blize), 326 (Whittaker); PX 425.

**243.** PX 45.

nated the Contract and forced CB to agree to an amended contract, by speaking ill of CB and, in effect, convincing Pfizer to terminate the Contract. While there is no evidence of what exactly was said at the Pfizer–ASG meeting, given what occurred the next day at the Pfizer–CB meeting, I infer that Defendants made a concerted effort at the April 13 meeting to convince Pfizer to use Kates's relocation to ASG as a basis to cancel its Contract with CB.

Defendants deny that their actions caused Pfizer to terminate the Contract, arguing that Pfizer was looking for a way out of the Contract and already had decided to terminate the Contract before the April 13 meeting.[244] I find, however, that Defendants' actions did contribute materially to Pfizer's decision to terminate the Contract and that without Defendants' interference Pfizer either would not have terminated the Contract or would have entered into an amended agreement on terms much more favorable to CB. Thus, Plaintiffs have shown the element of proximate causation.

Finally, Plaintiffs suffered damages due to Defendants' interference. As a result of Defendants' conduct, Pfizer amended and then terminated the Contract, causing CB to lose guaranteed minimum payments of $950,000 per quarter for one-off work for six quarters, as well as a large portion of the revenue derived from the FTE work called for in the Contract.[245]

While I must consider Plaintiffs' tortious interference claim in light of Defendants' privilege to compete in a fair and lawful manner, I find that Defendants did not act in such a manner. In particular, certain Defendants misappropriated proprietary CB information and trade secrets and used this information to steal business from CB. Additionally, Kates breached his fiduciary duties to CB and BR in ways that facilitated ASDI and ASG's ability to compete with Plaintiffs for Pfizer's business, and ASDI and Blize aided and abetted those breaches. Accordingly, I find Defendants ASDI, ASG, Blize, and Kates liable for tortious interference with Plaintiffs' prospective business relations as to the Pfizer Contract. The liability of Blize and Kates is based on, for example, their presence at the April 13 meeting with Pfizer, as well as their participation in the discussions with Paloni about taking the Pfizer Contract from CB in 2003 and early 2004.[246] These discussions and other actions related to them amounted to a breach of Kates's fiduciary duties to CB and BR and supported liability on the part of Blize, as well as ASDI, for aiding and abetting these breaches of fiduciary duty. In addition, the conduct of ASDI's principals, Blize and Paloni, in convincing Pfizer to terminate the Contract would subject ASDI to liability for tortious interference under the doctrine of *respondeat superior*. Finally, ASG is liable because, with Kates's help, it ultimately secured a contract with Pfizer that, in effect, replaced the CB Contract.

### 2. Repeat Catalog and One–Off Business

■ Plaintiffs also contend that Defendants tortiously interfered with their pro-

---

**244.** T. Tr. 1060, 1068–69 (Beard); PX 48.

**245.** PX 23. The Contract called for Pfizer to pay CB $230,520 per FTE in 2004 and $237,435 per FTE in 2005 for a minimum of sixteen FTEs. *Id.* §§ 1, 4.1. The amended contract required Pfizer to pay CB $230,520 per FTE for twenty-four FTEs from May 1 to July 31, 2004, twenty FTEs from August 1 to September 30, 2004, and nine FTEs from October 1 to December 31, 2004. Pfizer had no obligation to use any CB FTEs in 2005 under the amended contract and, in fact, did not use any CB FTEs in that year. DX 64 §§ 5.1–5.2.

**246.** T. Tr. 311 (Whittaker); PX 49.

spective business relations with their long-term catalog and one-off customers. Based on their stellar reputation in the industry and longstanding relationships with many customers, Plaintiffs assert that they had a reasonable probability of continuing to receive repeat business from those customers.[247]

Defendants counter that Plaintiffs failed to show a reasonable probability of receiving repeat catalog and one-off business. The evidence Plaintiffs produced on this issue consists of Susi Baylis–Powell's[248] trial testimony that CB had longstanding customers "back to 2002 and maybe prior," a Sales by Customer Summary comparing sales revenues between 2003, 2004, and 2005, and deposition testimony from Baylis–Powell discussing sales numbers for several clients between 2002 and 2004.[249] Based on this evidence, I find that CB had a reasonable probability of obtaining repeat business from its one-off and catalog customers. Baylis–Powell credibly explained with reference to a number of customers the sales history CB had with those customers and how the decrease in sales to many of those customers coincided with the period of alleged wrongdoing by Defendants. There is also evidence that, until ASG introduced its catalog, CB was the only seller of many of its catalog com-

pounds[250] and that customers were satisfied with CB's work.[251] Accordingly, I find that CB reasonably could have expected its one-off and catalog customers to continue using its services.

Defendants argue that they cannot be liable for intentionally interfering with CB's one-off and catalog business because a claim for tortious interference with prospective business relations will not lie where the challenged conduct in seeking a plaintiff's customers was at least partly competitive.[252] Defendants misconstrue the Restatement (Second) of Torts in making this assertion, however. The section Defendants rely upon identifies four requirements that all must be met to find that interference is not improper; an at least partly competitive intent is only one of these requirements.[253] Another requirement is that the actor not employ wrongful means, one which Defendants clearly cannot meet here. Accordingly, I reject Defendants' attempt to claim their conduct was not improper under the Restatement.

Ample evidence shows that Defendants intentionally interfered with Plaintiffs' one-off and catalog business. Defendants aimed to take all of CB's business and

---

**247.** Baylis–Powell Dep. 69–75, 80; PX 439.

**248.** Baylis–Powell has worked for CB since early 2001. She handled CB's accounting and reported to Beard and Kates during the relevant time period. T. Tr. 378–80 (Baylis–Powell).

**249.** Baylis–Powell Dep. 69–75, 80; PX 439.

**250.** Beard Dep. 657, 664–65.

**251.** T. Tr. 439 (Baylis–Powell), 681 (Kates); Clark Dep. 234–37; PX 64, 443. Although this praise of CB came from Pfizer, there is no reason to believe that CB provided lower quality work to its other customers.

**252.** Defs. ASDI and Blize's Answering Br. ("ADAB") 50 (citing RESTATEMENT (SECOND) OF TORTS § 768).

**253.** Section 768 of the Restatement (Second) of Torts provides that there is no improper interference if:

(a) the relation concerns a matter involved in the competition between the actor and the other and (b) the actor does not employ wrongful means and (c) his action does not create or continue an unlawful restraint of trade and (d) his purpose is at least in part to advance his interest in competing with the other.

make CB shut its doors.[254] Defendants also took or had access to large amounts of confidential CB information, and ASG used this information to solicit CB's customers and set up a catalog that mimicked CB's catalog and contained many of the same compounds.[255] This demonstrates that Defendants intentionally interfered with Plaintiffs' prospective business relations.

As for proximate causation, the record shows that but for Defendants' use of misappropriated CB information and Kates's breaches of his fiduciary duties they would have been far less successful, if at all, in taking one-off and catalog business away from CB.[256] I further find that the privilege to compete provides no protection for Defendants' conduct because they did not compete in a fair and lawful manner, as evidenced by their misappropriation of CB's trade secrets and confidential material.[257]

As to damages, the parties adduced somewhat conflicting evidence. A CB Sales by Customer Summary shows that total sales decreased from $6,989,529 in 2003 to $5,568,841 in 2004, a total of $1,420,679.[258] Defendants point to CB Custom Transaction Detail Reports, however, that show total CB catalog sales of $300,838 in 2003 and $331,236 in 2004, an increase of $30,398.[259] To establish liability, however, Plaintiffs need show only that they suffered some damage, not the precise amount of damage.[260] In that regard,

Plaintiffs clearly have met their burden. The CB Sales by Customer Summary is more comprehensive than the Custom Transaction Detail Reports on which Defendants rely. Still other evidence shows that before ASG entered the market, CB was the only seller of certain compounds via catalog and was selling these compounds at much higher prices than ASG later offered. Thus, even if CB's catalog sales increased from 2003 to 2004, it is still more likely than not that Plaintiffs suffered damages from Defendants' interference.[261] Accordingly, I find Defendants liable to CB for tortious interference with prospective business relations regarding CB's expectation of receiving repeat one-off and catalog business.[262]

In summary, I find Kates, Blize, ASG, and ASDI liable for tortious interference with CB's prospective catalog and one-off business. Kates is liable because he schemed with Blize and Paloni to bury CB, took large amounts of CB material with him from CB to ASG, solicited former CB customers, and was in charge of ASG while it improperly competed with CB. Blize is liable because he schemed to bury CB, aided and abetted Kates's breaches of his fiduciary duties to Plaintiffs, and, as a principal of ASDI, assisted ASG's interference with CB's catalog and one-off business. ASG is liable based on its knowing use of stolen CB material to compete with CB for catalog and one-off business.

254. T. Tr. 311, 320 (Whittaker), 511–12 (Cottone).

255. *See supra* note 87; PX 50–51, 53; Kates Dep. 447–51.

256. Baylis–Powell Dep. 69–75; Kates Dep. 447–51; T. Tr. 532, 536 (Cottone); PX 257–258, 321, 439.

257. *See supra* note 87.

258. PX 439.

259. DX 211–212.

260. *See Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1176 (3d Cir.1993).

261. *See supra* notes 84, 85.

262. Because BR only did FTE work and this claim relates exclusively to catalog and one-off work, Defendants are liable only to CB on this claim, and not BR.

ASDI is liable because the scheme to bury CB was the idea of its principals, Blize and Paloni, and it funded ASG and generally encouraged ASG to compete with CB through a catalog business and otherwise.

## E. Damages

 Plaintiffs must prove their damages by a preponderance of the evidence.[263] Delaware does not "require certainty in the award of damages where a wrong has been proven and injury established." [264] Indeed, "[t]he quantum of proof required to establish the amount of damage is not as great as that required to establish the fact of damage." [265] Responsible estimates of damages that lack mathematical certainty are permissible so long as the court has a basis to make such a responsible estimate.[266] Public policy has led Delaware courts to show a general willingness to make a wrongdoer "bear the risk of uncertainty of a damages calculation where the calculation cannot be mathematically proven." [267] Nevertheless, when acting as the fact finder, this Court may not set damages based on mere "speculation or conjecture" where a plaintiff fails to adequately prove damages.[268]

### 1. Admissibility of Dr. Scott Jones's testimony

 Defendants seek to exclude the testimony of Plaintiffs' damages expert, Dr. Scott Jones, on the same grounds they challenged Grabowski's testimony, namely, that it is unreliable under *Daubert* and goes beyond the scope of Jones's expert report. Having already recited the legal standards governing Defendants' objections, I reprise them only briefly here. Under *Daubert,* a court will exclude an expert witness's testimony if that testimony is not both relevant and reliable.[269] Also, while a party is only required to "state the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion," a court may exclude an expert's trial testimony if it cannot fairly be said to fall within the topics covered by his expert report.[270]

 Defendants raise a plethora of objections to Jones's opinions, which they denigrate as "not up to professional standards for a valuation analysis." [271] First, Defendants question the relevance and reliability of Jones's damages opinion because he made no attempt to show

---

**263.** *Great Am. Opportunities, Inc. v. Cherrydale Fundraising, LLC,* 2010 WL 338219, at *22 (Del.Ch. Jan. 29, 2010).

**264.** *Del. Express Shuttle, Inc. v. Older,* 2002 WL 31458243, at *15 (Del.Ch. Oct. 23, 2002) (quoting *Red Sail Easter Ltd. P'rs, L.P. v. Radio City Music Hall Prods., Inc.,* 1992 WL 251380, at *7 (Del.Ch. Sept. 29, 1992)).

**265.** *Total Care Physicians, P.A. v. O'Hara,* 2003 WL 21733023, at *3 (Del.Super. July 10, 2003).

**266.** *Del. Express Shuttle,* 2002 WL 31458243, at *15 (quoting *Red Sail Easter,* 1992 WL 251380, at *7).

**267.** *Great Am. Opportunities,* 2010 WL 338219, at *23 (citing *Duncan v. TheraTx, Inc.,* 775 A.2d 1019, 1023 (Del.2001); *Henne*

*v. Balick,* 146 A.2d 394, 396 (Del.1958); *Gotham P'rs, L.P. v. Hallwood Realty P'rs, L.P.,* 855 A.2d 1059, 1067 (Del.Ch.2003); *Dionisi v. DeCampli,* 1995 WL 398536, at *18 (Del. Ch. June 28, 1995)).

**268.** *Medek v. Medek,* 2009 WL 2005365, at *12 n. 78 (Del.Ch. July 1, 2009) (quoting *Henne,* 146 A.2d at 396).

**269.** *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

**270.** Ct. Ch. R. 26(b)(4)(A)(i).

**271.** T. Tr. 1240 (Metrick).

causation, *i.e.*, that there is a connection between Defendants' actions and his damages estimate. Plaintiffs respond by arguing that, generally, a damages expert is not responsible for proving causation. I agree. Plaintiffs proved through other witnesses and evidence that Defendants engaged in certain misconduct and that Plaintiffs suffered damages as a result; this suffices to show causation. A damages expert focuses on quantifying the damages suffered, which is what Jones attempted to do here.

Next, Defendants complain that Jones failed to account for industry-related factors in his analysis. This argument may go to the weight Jones's opinions deserve, but it does not warrant excluding those opinions from evidence. Moreover, Jones did consider at least some industry-related factors. He relied, for example, on statements from Plaintiffs' management indicating that CB was in a good position to weather ongoing changes in its industry, and the evidence supports that view.[272]

Defendants next criticize Jones's failure to allocate damages among the different tort claims Plaintiffs have pursued. Jones essentially provided only one general damages number designed to cover the total loss to Plaintiffs' business from all of Defendants' actions. In the circumstances of this case, however, that does not render Jones's testimony irrelevant or unreliable. As Jones correctly stated, it is the Court's responsibility to allocate damages among various torts.[273] In addition, I find that Jones's general opinions as to a damages

estimate are sufficiently relevant to meet the requirements of *Daubert* because Plaintiffs succeeded in proving most of their claims and the damages from Defendants' various wrongs tend to overlap.[274] In fact, aspects of all three elements of Jones's damages estimate, loss in value to Plaintiffs' business, lost cash flow, and loss of the Pfizer Contract, can be attributed to wrongs for which I have found Defendants liable.

Defendants also assert that Jones's testimony did not fit the evidence because he calculated damages through the end of 2007, whereas CB could not have suffered any damages after its September 1, 2005 sale to Adesis. Jones, however, testified that his damages estimate could be scaled back to account for damages at any point in time.[275] I credit that testimony and note that both sides now agree that any damages should be determined as of September 1, 2005.

Defendants further accuse Jones of altering his testimony between the time of his deposition and trial. Based on the nature of the changes involved here, I do not consider this a cause for concern. Jones had time between his deposition and trial to revisit his views in light of criticisms raised by Defendants at his deposition. Within reason, there is nothing wrong with an expert changing earlier views to make them more accurate. The propriety and importance of the changes can be explored on cross-examination.

Finally, Defendants complain that Jones testified at trial about several matters that

---

272. Clark Dep. 236–37 (stating that CB was not included in Pfizer's plan for terminating domestic CROs in favor of foreign ones and that "CB was a very good provider, was one of the few U.S. companies that we actually wanted to retain.").

273. T. Tr. 1192 (Jones).

274. In that regard, I recognize that Jones's estimate appears to include damages attributable to defamation, a claim Plaintiffs dropped before trial began. I have taken that fact into consideration in making my damages determination.

275. T. Tr. 1116, 1120.

were not disclosed in his expert report or deposition, including "the substance of Dr. Jones' conversations with management or . . . that certain assumptions on which his analysis was based came solely from discussions with management as opposed to testable data."[276] These criticisms are mere nit-picking. Not only are these minor points, but both could have been covered in Jones's deposition. Indeed, Defendants deposed Jones at length about his interviews with Plaintiffs' management. Furthermore, there is no requirement that every detail of an expert's calculations be disclosed before trial; "a summary of the grounds for each opinion" is sufficient.[277]

In sum, none of Defendants' objections warrant the exclusion or material limitation of Jones's testimony. Therefore, I overrule those objections. To the extent some of Defendants' criticisms have merit, they go to the weight to be given to Jones's opinions, rather than their admissibility.

### 2. The components of Jones's Damages Opinion

Jones's estimate of the damages Plaintiffs suffered consists of three elements: loss in value to Plaintiffs' business, lost cash flow, and loss of the Pfizer Contract. As explained in the sections below, I find the first two of these damages elements, the loss in value of Plaintiffs' business and the lost cash flow, sufficient to support a responsible estimate of the damages suffered by CB and BR as a result of the wrongs alleged in this action. The third category, the loss of the Pfizer Contract, attempts to account for damages that already are provided for in the first two damages elements. Thus, I decline to award Plaintiffs any damages based solely on the loss of the Pfizer Contract.

#### a. Loss in value to Plaintiffs' business

Jones's first element purports to measure the loss in value to Plaintiffs' business as a going concern based on Defendants' alleged wrongs and represents the additional consideration Plaintiffs would have received for their business but for Defendants' wrongful conduct. As to this element, Jones opined in his expert report that the loss in value to Plaintiffs' business was $8.2 million, which he calculated by averaging the results of two different loss valuation methods, a sales revenue method and a net income method.[278]

Defendants challenge this aspect of Jones's opinion on several grounds. Initially, Defendants correctly note that the period covered by Jones's estimate does not conform to the relevant time period for damages. Jones's $8.2 million number covers the period from 2003 through 2007. Including losses from 2003, however, is incorrect because Plaintiffs did not prove that their business was adversely affected in 2003 by Defendants' wrongful conduct. ASG, whose illegal competition with Plaintiffs caused the vast majority of Plaintiffs' damages, did not begin operations until 2004, and Pfizer terminated the CB Contract in April 2004. Although Kates began breaching his fiduciary duties in 2003 and his breaches appear to have enhanced ASG's ability to compete with Plaintiffs, there is no evidence of any quantifiable damage to Plaintiffs' business until ASG began its operations in 2004. Similarly, Jones erred in extending the damages period through 2007. By the time of the post-trial argument, counsel for all parties

---

**276.** ADAB 54.

**277.** Ct. Ch. R. 26(b)(4)(A)(i).

**278.** PX 437 at Amended Report 7 (PX 437 contains both Jones's original expert report ("Original Report") and his amended expert report ("Amended Report")).

agreed that the relevant damages period ended on August 31, 2005 because Plaintiffs sold their business to Adesis on September 1, 2005. Thus, I find it appropriate to award damages only for the period from the beginning of 2004 until August 31, 2005.

To value Plaintiffs' business using a sales revenue estimate, Jones first projected Plaintiffs' sales revenue after 2002 using an ordinary least squares regression based on Plaintiffs' actual sales revenue from 1995 through 2002. Jones then took the difference between Plaintiffs' actual sales revenue and projected revenue for each year from 2003 to 2007 and multiplied these results by 0.6, a composite multiplier based on sales revenue multiples reported for actual business enterprise sales of comparable companies, to determine the loss in enterprise value Plaintiffs would have suffered as of the end of each individual year.[279] Defendants raise no real objection to Jones's sales revenue calculations for the relevant time period of 2004 and 2005. Using his projections of sales, Jones estimated a loss of sales revenue in 2004 of $3,951,823 and in 2005 of $9,474,943.[280] As Defendants' damages expert, Dr. Andrew Metrick ("Metrick"), pointed out, however, the relevant time period for valuing Plaintiffs' business is as of September 1, 2005. To compute the enterprise value using Jones's estimated sales revenue method as of that date, the Court must use the estimated loss in revenue for the twelve months ending on August 31, 2005. Jones did not calculate that number, but, as Me-

trick implied, it could be derived by taking 2/3 of the loss in sales revenues computed by Jones for the calendar year 2005, to account for the period through August 2005, and adding to that 1/3 of the loss in sales revenues for 2004, to cover the last four months of 2004. Performing that calculation yields an estimate of lost revenues for the twelve month period ending August 31, 2005 of $7,634,907. According to Jones, the loss in enterprise value of Plaintiffs' business as of the relevant date would then be captured by multiplying the residual of loss in sales revenues by the comparables multiple of 0.6.[281] Performing that calculation results in a revenue-based estimate of the loss in valuation of Plaintiffs' business of $4,580,944.

Metrick argues that the $3.4 million price CB received from the sale to Adesis should be subtracted from the valuation number. But, in making that statement, Metrick was working with the total predicted sales revenues for the relevant time period, rather than the difference between the predicted and actual revenues for the period in question, as Jones did. Metrick's comment makes sense in the context he made it. It does not translate to Jones's approach of focusing on the loss of revenue, however, because in that case Jones already subtracted out the actual sales revenues and thereby arguably accounted, at least roughly, for the consideration Plaintiffs would have received based on that revenue stream.

It is not inconsequential, however, whether I use Jones's method, which fo-

279. *Id.* at Original Report 10–12. Jones arrived at the 0.6 sales revenue multiplier by looking at valuation tables in Inc. Magazine. Jones treated as "comparable" companies Inc. Magazine listed in the business services, engineering services, and physical research services categories. Defendants criticize Jones's use of these categories as being overbroad and contend that he should have looked

at the company values of other CROs. I consider Jones's methodology in this regard adequate to support a responsible estimate of damages and, therefore, credit this aspect of his testimony.

280. *Id.* at Original Report 12.

281. *Id.*

cuses solely on the losses in annual revenue and net income as calculated by subtracting the actual figures from the predicted figures for that period, or Metrick's variation of that method, which capitalizes the predicted revenue and net income streams and then nets out the $3.4 million in consideration CB received from the sale of Plaintiffs' business on September 1, 2005. Both methods produce numbers in the same general range, but Jones's method results in a loss of business value determined by the revenue method, for example, that exceeds Metrick's calculation of that number by almost $870,000.

Having considered the reports and testimony of both experts carefully, I generally found Metrick's opinions more convincing. In addition, using Jones's method in its entirety to compute the loss of value to Plaintiffs' business requires greater reliance on the assumptions Jones made as to comparable companies and so on, compared to Metrick's variation of that approach, which used the price of $3.4 million CB actually received when it sold Plaintiffs' business. Therefore, I consider it more appropriate and reliable to use Metrick's approach, and I have done so in the revenue and net income calculations summarized below.

Metrick's sales revenue-based estimate of loss of business value is $3,711,081. Metrick calculated this number by first projecting revenue for the 12 months ending September 1, 2005, the date of CB's sale to Adesis, which he did by taking 1/3 of Jones's projected 2004 revenue (to account for the last 4 months of 2004) and adding this result to 2/3 of Jones's project-

ed 2005 revenue (to account for the first 8 months of 2005). Metrick then multiplied that result ($11,851,801) by 0.6, Jones's sales revenue multiplier, which yielded a result of $7,111,081, from which Metrick subtracted the $3.4 million CB received in the sale to Adesis.[282]

In calculating the net income estimate, Jones took the difference between Plaintiffs' actual net income and their 2002 net income for each year from 2003 to 2007 and then multiplied these differences by 3.0, a multiplier based on net income multiples of Jones's comparable companies.[283] This gave Jones an estimated loss in company value based on net income at the end of each year from 2003 to 2007.[284]

Defendants object to Jones's net income calculation and, specifically, to his decision to rely solely on data from 2002. CB and BR's combined net income was much higher in 2002 than in any other year, either before or since. Jones attempts to justify his use of data from 2002 by noting that it is the year immediately before the Pfizer Contract went into effect and Kates's breaches of fiduciary duty began. I agree with Defendants and Metrick, however, that the net income for 2002 is neither a representative nor a reliable basis for estimating CB's value. Instead, I accept Metrick's net income estimate, which he obtained by first calculating a weighted-average net margin of 15.5 percent based on CB/BR's total actual sales and actual net income from 1995 to 2002 and then applying the net margin to the relevant projected sales revenue figure.[285] Using Metrick's approach, I computed the predicted net income figure for the twelve months ending August 31, 2005 to be

**282.** DX 223 at 17–18.

**283.** Again this multiplier is based on data from Inc. Magazine.

**284.** PX 437 at Original Report 10, 12–14, Amended Report 6.

**285.** DX 223 at 18–20.

$1,837,029 ($11,851,801 × 0.155). I then multiplied this number by 3.0, Jones's net income multiplier, yielding an estimated valuation of $5,511,087, from which I subtracted the $3.4 million price paid by Adesis to obtain a net income-based estimate of the loss of business value of $2,111,087. Averaging the $3,711,081 sales revenue estimate and the $2,111,087 net income estimate yields damages stemming from Plaintiffs' loss of business value of $2,911,084.

### b. Lost cash flow

Jones's second element of damages is lost cash flow or net income during the period before the sale to Adesis on September 1, 2005. For the same reasons stated in the previous section, the relevant period is 2004 and the first eight months of 2005. Jones estimated Plaintiffs' lost net income for this purpose in the same way he estimated it in developing the loss in business value. That is, Jones estimated the loss in net income by relying solely on 2002 net income. I reject this approach for the same reasons stated *supra* with respect to the estimate of the loss in the enterprise value of Plaintiffs' business. Instead, I used the alternative calculation provided by Metrick that applies a 15.5 percent net margin to Jones's revenue projections to come up with a net income projection. I then determined cash flow losses for 2004 and the first eight months of 2005 by taking the difference between Metrick's net income projections and CB/BR's actual net income.[286] Consistent with Metrick's calculations, I therefore estimate Plaintiffs' lost cash flow to be $969,683 for 2004 and $457,696 for the first eight months of 2005, for a total of $1,427,379.

Thus, I find that Plaintiffs suffered damages from loss of cash flow in the amount of $1,427,379 before September 1, 2005 that must be added to the loss of value in the business as a going concern as of that date to obtain Plaintiffs' damages due to Defendants' wrongs.

### c. Loss of the Pfizer Contract

The third and final element of Jones's damages estimate is the loss of the Pfizer Contract. Jones calculated damages from the loss of the Contract through 2007 to be $5.4 million. Defendants strenuously dispute Plaintiffs' ability to claim separate damages for the loss of the Pfizer Contract, arguing that these damages already are included in the damages claimed for loss of business value and lost cash flow. I agree. Plaintiffs reasoned that the Pfizer Contract increased the value of CB and BR by validating their business and guaranteeing future income at a base level, with the likelihood of increased income over time.[287] Importantly, however, Jones based his opinion on an assumption that Pfizer would renew the Contract upon its expiration at the end of 2005.[288] Nothing in the record, however, supports this belief, as Jones admitted at trial.[289] In fact, I find that Pfizer was unlikely to renew the Contract, at least on its original terms.[290] In addition, Jones's estimates for lost cash flow and loss of business value suffered by Plaintiffs appear to encompass all of Plaintiffs' revenue sources, including the Pfizer Contract. Nothing in Jones's report or his calculations suggests that the estimates of lost cash flow and loss in business value did not include the effects of the Pfizer Contract. Therefore, to the extent Jones attempts to claim an additional amount of

---

**286.** DX 223 at 23–26.

**287.** POB 56.

**288.** T. Tr. 1182–83 (Jones).

**289.** *Id.* at 1183.

**290.** PX 48; T. Tr. 435–38 (Baylis–Powell), 1060 (Beard).

damages based on the Pfizer Contract, he is engaged in double counting. Accordingly, I find that Plaintiffs did not suffer any damages from the loss of the Pfizer Contract that are separate and apart from the damages based on their loss of business value and lost cash flow.

For the foregoing reasons, I award Plaintiffs $4,338,463 in damages ($2,911,084 for loss of business value and $1,427,379 for lost cash flow) against ASDI, ASG, Blize, and Kates, jointly and severally, for the wrongs they committed against Plaintiffs, namely, for breaches of fiduciary duties or aiding and abetting such breaches and for tortious interference with prospective business relations. Defendants seek to offset against this amount the payment Plaintiffs received in their settlement with Pfizer. As I noted at oral argument and now hold, however, Defendants have failed to prove that they are entitled to a set-off based on Plaintiffs' settlement with Pfizer.[291] Thus, I deny Defendants' request for a set-off.

### 3. Loss stemming from misappropriation of trade secrets

■ I have held one Defendant, Smith, liable solely for misappropriation of trade secrets in the form of the CB Tree–Based Catalog System and Catalog Experimentals, but not on any of Plaintiffs' other claims.[292] Consequently, I must attempt to isolate the amount of damages caused by Defendants' misappropriation of trade secrets and, therefore, owed by Smith.

Under DUTSA, "a complainant is entitled to recover damages for misappropria-

tion. Damages can include both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss."[293] Because I found that several Defendants, including Smith, misappropriated the CB Tree–Based Catalog System and the CB Catalog Experimentals, which relate solely to CB's catalog business, damages stemming from this misappropriation will be any lost catalog sales Plaintiffs can prove.

Defendants contend that Plaintiffs did not suffer any damages from the misappropriation because CB had more catalog sales revenue in 2004 ($331,236) and the first eight months of 2005 ($316,225), the periods in which Defendants' tortious conduct harmed Plaintiffs, than in 2003 ($300,838).[294] An increase in CB's catalog sales revenues from one year to the next does not preclude the existence of damages, however. To the contrary, the evidence shows that ASG sold compounds in the relevant period that previously were sold only by CB and charged only one-third of CB's prices.[295] In the circumstances here, I find that absent Defendants' misappropriation of trade secrets, CB would have made those sales and, thus, suffered damages to the extent of its lost profits on those sales.

Plaintiffs adduced sufficient evidence at trial to permit a responsible estimate of damages based on ASG's sales of CB catalog compounds to two customers, Pfizer and Alfa Aesar. On December 22, 2004, ASG sent Pfizer an invoice for $174,760

---

291. Arg. Tr. 46.

292. In that regard, Smith is jointly and severally liable with his co-Defendants ASDI, ASG, and Kates. Those three Defendants also are liable for other wrongs. Because the damages for those other wrongs exceed and overlap with the damages for misappropriation of

trade secrets, I limit my comments in this section to Smith.

293. 6 *Del. C.* § 2003(a).

294. DX 211–213.

295. *See supra* notes 84, 85.

worth of compounds that were in the CB catalog or analogous to such compounds.[296] Assuming CB would have sold these compounds for triple the price [297] and made a profit of 40 percent on the sale,[298] CB would have realized a profit of $209,712. Alfa Aesar purchased $382,360 worth of catalog compounds from ASG and ASDI.[299] Assuming the same price and profit range as with the Pfizer compounds, CB would have made a profit of $458,832 on this sale. Thus, after combining CB's "profits" from the Pfizer and Alfa Aesar sales, I find that Plaintiffs are entitled to $668,544 in damages for Defendants' misappropriation of trade secrets.[300]

#### 4. Interest

Plaintiffs also seek an award of pre- and post-judgment interest.[301] Dela-ware courts award prejudgment interest as a matter of right. Such interest is to be awarded from the date payment is due.[302] In the absence of an express contract rate, Delaware courts use the "legal rate" as a default rate.[303] Here, I find that Plaintiffs were due payments for their 2004 lost cash flow on December 31, 2004 and for both their 2005 lost cash flow and the loss of business value on September 1, 2005, the date CB was sold to Adesis. Accordingly, Plaintiffs are owed prejudgment interest on $969,683 from December 31, 2004 and on $3,368,780 from September 1, 2005 to the date of the judgment based on this Opinion. Thus, I award Plaintiffs prejudgment interest in these amounts compounded quarterly at the legal rate.[304]

Delaware courts also routinely grant

---

**296.** PX 57.

**297.** T. Tr. 532 (Cottone).

**298.** Plaintiffs allege that their profit margin was 44 percent on one-off work and 46.76 percent on FTE work. PRB 37. Based on ASG's ability to sell catalog compounds at 1/3 CB's price and presumably still make some profit, I infer that CB's profit on catalog work would have been in the range of at least 40 percent.

**299.** PX 242.

**300.** Based on this finding, I hold that Smith is jointly and severally liable for only $668,544 of the $4,338,463 damages award. The other Defendants found liable, including Blize, who I found liable for aiding and abetting breaches of fiduciary duty and tortious inference with prospective business relations, but not misappropriation of trade secrets, are jointly and severally liable for the entire $4,338,463 in damages. In that regard, I note that the misappropriation of trade secrets damages effectively are subsumed within the other damages for loss in business value and lost cash flow. Additionally, there is some overlap in the sense that the compensatory damages for tortious interference with prospective business relations would include the misappropriation damages, as well.

**301.** Joint Pretrial Stip. and Order 6; Arg. Tr. 44.

**302.** *Underbrink v. Warrior Energy Servs. Corp.*, 2008 WL 2262316, at *19 (Del.Ch. May 30, 2008) (citing *Citadel Hldg. Corp. v. Roven*, 603 A.2d 818, 826 (Del.1992)); *see also Trans World Airlines, Inc. v. Summa Corp.*, 1987 WL 5778, at *3 (Del.Ch. Jan. 21, 1987) ("The purpose of prejudgment interest is to compensate plaintiffs for losses suffered from the inability to use the money awarded during the time it was not available.").

**303.** *See* 6 *Del. C.* § 2301(a) ("Where there is no expressed contract rate, the legal rate of interest shall be 5% over the Federal Reserve discount rate including any surcharge as of the time from which interest is due.").

**304.** *See Great Am. Opportunities, Inc. v. Cherrydale Fundraising, LLC*, 2010 WL 338219, at *30 (Del.Ch. Jan. 29, 2010). I further find that ASDI, ASG, Blize, and Kates are jointly and severally liable for the entire amount of prejudgment interest, while Smith is jointly and severally liable only for interest accruing on $668,544, with that interest accruing from December 31, 2004.

post-judgment interest.[305] Seeing no reason to depart from this practice, I award Plaintiffs post-judgment interest on the full amount of the judgment, including that part comprised of prejudgment interest.[306]

## III. CONCLUSION

For the foregoing reasons, I find that: (1) ASDI, ASG, Kates, and Smith are liable for misappropriation of trade secrets, namely the CB Tree–Based Catalog System and the CB Catalog Experimentals, but Blize, Jones, and Wagaman are not; (2) Kates is liable for breaches of fiduciary duty; (3) ASDI and Blize are liable for aiding and abetting Kates's breaches of fiduciary duty, but ASG is not; (4) none of Defendants are liable for tortious interference with contractual relations; (5) ASDI, ASG, Blize, and Kates are liable for tortious interference with prospective business relations with respect to Pfizer, but Jones, Smith and Wagaman are not; and (6) ASDI, ASG, Blize, and Kates are liable for tortious interference with prospective business relations with respect to CB's expectation of repeat one-off and catalog business, but Jones, Smith, and Wagaman

are not. Based on the harm they have caused to Plaintiffs, I find ASDI, ASG, Blize, and Kates jointly and severally liable to Plaintiffs for damages in the amount of $4,338,463, and Smith liable to Plaintiffs jointly and severally with ASDI, ASG, and Kates for damages in the amount of $668,544, for misappropriation of trade secrets, but that amount is not cumulative with the larger damages award. In addition, all liable Defendants owe pre- and post-judgment interest on the amounts awarded against them as specified in this Opinion.

Counsel for Plaintiffs shall submit, on notice, a proposed form of final judgment reflecting these rulings within ten days of the date of this Opinion. The proposed form of final judgment should include a request for attorneys' fees and expenses as per the Spoliation Opinion.[307]

---

**305.** *Underbrink*, 2008 WL 2262316, at *19.

**306.** *See Great Am. Opportunities*, 2010 WL 338219, at *30; *Brandin v. Gottlieb*, 2000 WL 1005954, at *30 (Del.Ch. July 13, 2000) (noting that without compound, post-judgment interest on the full amount, a judgment debtor could "chip away at the real value" of a judgment by delaying payment).

**307.** In the Spoliation Opinion, I held that Plaintiffs were entitled to "their attorneys' fees and expenses, including expert fees, associated with this Motion for sanctions jointly and severally against Kates, ASDI, and ASG." *Beard Research, Inc. v. Kates*, 981 A.2d 1175, 1194 (Del.Ch.2009).